Argued November 24, 1948; reargued March 16; argued on rehearing September 29; former decision adhered to, reversed and remanded December 20, 1949

# McIVER *v.* NORMAN

205 P. (2d) 137

213 P. (2d) 144

*Robert O. Boyd* and *Thomas L. Gatch,* of Portland, argued the cause for appellant. On the brief were Boyd, Ferris and Erwin, of Portland.

*Walter H. Evans, Jr.* of Portland, argued the cause for respondent. On the brief were Krause & Evans and C. W. Pecore, of Portland.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, KELLY and BAILEY, Justices.

KELLY, J.

On September 5, 1941, the parties hereto, plaintiff and defendant, executed the following written agreement:

"This is an agreement between William Norman and James W. McIver.

Wherein they have entered into an agreement for the sole and exclusive purpose and restricted to title holding of a certain piece of property known as Lot 1 and the westerly fifteen (15) feet of Lot Two (2), in Block Two (2), situated in Arlington Heights, City of Portland, Oregon;

Wherein said parties are to share equally in the profit or loss resulting from the sale of a residence to be constructed on said property by Equitable Service Inc., said profit shall be the net return after payment of $500.00 to Equitable Service Inc. for the construction of and supervision of construction of said residence, and after the payment of the actual cost of construction and any sale or loan costs incident to the construction and sale of the aforementioned residence.

Mutually agreed to and signed this 5th day of September, 1941, Portland, Oregon."

The Equitable Service Inc., mentioned in the foregoing agreement, was a corporation controlled by plaintiff.

At the time the foregoing agreement was executed, namely on September 5, 1941, defendant and his wife held a contract with Properties Incorporated, a corporation, owner of the real property mentioned in said agreement, whereby the parties, defendant and his wife and said Properties Incorporated agreed that defendant and his wife would purchase and Properties Incorporated would sell said real property; and on October 3, 1941, said Properties Incorporated executed a deed thereto wherein said corporation was grantor and defendant and his wife were grantees.

On or about October 3, 1941, defendant and his wife executed a mortgage on the premises in suit for the sum of $5,000.00 to the First Federal Savings & Loan Association of Portland, Oregon, the proceeds from which were to be expended in payment of the costs of construction of the building in suit. The note secured by said mortgage was dated October 3, 1941, and was signed by plaintiff and by defendant and his wife as the joint and several makers thereof.

During the progress of constructing the building on the premises in suit, it became necessary to change the plans and specifications which was done.

Plaintiff contends that the First Federal Savings and Loan Association refused to honor requisitions properly made by Equitable Service Inc., which necessitated withholding further work of construction when the building was practically completed.

On the 9th day of September, 1942, the Equitable Service Inc. filed a purported notice of mechanics' lien against the property in suit. Later, in a suit institued

by defendant and his wife, a decree was entered by consent discharging and satisfying of record said mechanics' lien and claim.

On November 3, 1942, defendant and his wife moved into the house upon the premises in suit and ever since have been living and making their home therein.

Three grounds are relied upon by defendant in support of his contention that plaintiff is not entitled to an accounting, namely: (1) That plaintiff abandoned the enterprise; (2) that an accounting was had; and (3) that plaintiff has been guilty of laches.

The trial court also applied the equitable doctrine of speculative delay.

At the outset of our discussion of these contentions, we think it necessary to mention the status of the parties plaintiff and defendant in reference to each other. Plainly that status was that of coadventurers in a speculative joint adventure.

The most direct and definitive statement of this status and the principles of law and procedure applicable to it, is to be found in a decision of this court by the late Mr. Justice HENRY J. BEAN as follows:

"The modern decisions indicate that the courts regard the right of joint adventurers, in matters between themselves, as governed by the principles constituting and controlling the law of partnership: 15 R. C. L. p. 500, sec. 1. We quote from page 501, Section 3, of that volume:

'The relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee to whom the deal or property may be intrusted, and such trustee will be held strictly to account to his coadventurers and he will not be permitted, by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater

rights in the property, by reason of the fact that he is in possession of the property or profits as trustee, than his coadventurers are entitled to. The mere fact that he is intrusted with the rights of his coadventurers imposes on him the duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers, and if he is recreant to his trust, any rights they may be denied are recoverable.' " *Thimsen v. Reigard,* 95 Or. 45, 54, 186 P. 559.

■ The purported abandonment, upon which defendant relies, depends upon the fact that, as stated, plaintiff did not entirely complete the construction of the house in suit; that he failed to make his contribution to some of the installments of interest due upon the mortgage from the proceeds of which funds were secured to carry on the joint adventure; that he stated to a third party, who was attempting to collect a small bill for plumbing, that he had no interest in the building, and he verified the foregoing mentioned mechanics' lien on the premises in suit which purported lien was in favor of Equitable Service Inc. of which corporation plaintiff was president and the principal stockholder. As stated, a consent decree was entered discharging and satisfying of record that mechanics' lien. Plaintiff testified that his purpose in filing it was to protect the enterprise against purported impending liens against the property.

Plaintiff testified, as shown above, that the mortgagee refused to honor requisitions for money to pay the Equitable Service Inc. for material and labor, hence plaintiff refrained from paying his part of the interest and did not require the Equitable Service Inc. to proceed further with construction.

We think the record does not support defendant's

claim that plaintiff abandoned the enterprise. We think the defendant's course in taking possession of the residence in suit, in refusing to meet with plaintiff for a consideration of the accounts in which they were mutually interested, and in failing to offer to account for a reasonable rental charge for occupancy of the premises were contributing causes of the disagreement between plaintiff and defendant.

■ Defendant's ground for saying that there was an accounting between the parties plaintiff and defendant is based upon a written statement furnished plaintiff by defendant. This document discloses defendant's version of the status of the account between them. There was no concurrence therein by plaintiff, and in no sense could it be deemed an accounting wherein a balance was struck and the respective interests of the parties determined.

As to the defense of laches, we have but to refer to the statement of Mr. Justice BAILEY as follows:

"It has been held a number of times by this court that 'mere delay itself does not constitute laches unless the delay works to the injury of another.'" *City of Pendleton v. Holman,* 177 Or. 532, 547, 164 P. 2d 434, 162 A. L. R. 249, citing *American Surety Company of New York v. Multnomah County,* 171 Or. 287, 324, 138 P. 2d 597, 148 A. L. R. 926; *Wills v. Nehalem Coal Company,* 52 Or. 70, 90, 96 P. 528; *Wilson v. Wilson,* 41 Or. 459, 464, 69 P. 923; *State of Oregon v. Warner Valley Stock Company,* 56 Or. 283, 106 P. 780, 108 P. 861.

■ We adhere to the principle thus so often approved by this court. In other words, delay alone is not sufficient to justify the interposition of the defense of laches, but it must be prejudicial delay. 2 Pomeroy's

Equity Jurisprudence (5th Ed.) pp. 177-179, Section 419d.

Defendant cites Section 1-206, O. C. L. A., which is a provision of the Oregon Code prescribing two years as the time within which an action at law may be instituted for assault, battery, false imprisonment, for criminal conversation or for any injury to the person or rights of another not arising on contract and not therein especially enumerated and also upon a statute for a forfeiture or penalty to the state or county.

■ This being a suit in equity as distinguished from an action at law, and not being a proceeding based upon battery, false imprisonment, criminal conversation or for any injury to the person or rights of another *not arising on contract,* or for a forfeiture or penalty to the state or county, obviously, the citation is not germane to any issue presented by the instant case. (Italics supplied.)

■ Included in *Livermore v. Beal,* 18 Cal. App. 2d 535, 64 P. 2d 987, cited by defendant, are four suits to quiet title. The parties thereto were not joint adventures or partners. The holding therein gives effect to the judicial knowledge of the court with reference to the orders made by the Secretary of the Interior and Commissioner of the General Land Office of the United States, in determining whether plaintiff's complaint was demurrable and applying such judicial knowledge in support of defendant's.demurrers. It is there stated that laches may be shown by a demurrer. In the instant case, no fact appears to have been supported by the judicial knowledge of the court not affirmatively shown in the record before it. The facts are that plaintiff and defendant entered into a written contract by the express terms of which they became joint adventurers. One of

those joint adventures, the plaintiff, seeks an accounting with the other, the defendant. Since that relationship of the parties was established no such change of circumstances has occurred as to render the defendants prejudiced or damaged and hence the defense of laches is not available to defendant. The value of the property has increased so that a substantial profit would be assured upon the sale thereof.

The case of *Bower v. Stein,* 177 Fed. 673, affirming 165 Fed. 232, is a suit to set aside a sale of real property upon execution issued upon a judgment and decree of foreclosure. The court gave effect to the constructive knowledge of the record of muniments of title and sustained a demurrer to plaintiff's complaint. The muniment of title to the property involved in the instant case, being the deed thereto of defendant, cannot have the effect of depriving plaintiff of the right to an accounting. Plaintiff is not seeking to set defendant's deed aside.

Moreover in none of the cases, cited by defendant to the point that plaintiff has been guilty of laches, is the relationship of the parties plaintiff and defendant shown to be that of joint adventurers.

■ We think that the defense of speculative delay suggested by the learned trial judge is not applicable to a joint enterprise having for its avowed purpose speculative profits to be realized some time in the unknown future by the sale of a house yet to be built and sold.

■ This court is committed to the view that regardless of when a partnership has been dissolved, it remains in force for the purposes of winding up its affairs. *Carrey v. Haun, et al,* 111 Or. 586, 227 P. 315, citing *Riggen Investment Co.,* 31 Or. 35, 38, 47 P. 923; *McKinnis v. Dodge,* 103 Or. 9, 13, 203 P. 876; and

*Houser v. Irvine,* 3 Watts & Serg. (Pa.) 345, 38 Am.
Dec. 768.

■ Applying this principle to the instant case,
which, as stated, is a suit for an accounting instituted by
plaintiff against his coadventurer, we are constrained
to hold that the relationship of joint adventurers re-
mains in force regardless of differences between them
for the purpose of winding up the affairs of such joint
adventure.

For these reasons, the decree of the circuit court is
reversed and the cause is remanded in order that an
accounting may be had between the plaintiff and de-
fendant, and for such further proceedings as may not
be inconsistent herewith.

## On Rehearing

Before Lusk, Chief Justice, and Brand, Rossman,
Bailey, Hay and Page, Justices.

Former decision adhered to; reversed and re-
manded.

This is a suit by one of two joint adventurers
against the other for dissolution of the joint adventure,
an accounting, and other relief. The Circuit Court, in
a memorandum opinion, held that the plaintiff was
barred by laches, that "the case falls within the
principle of speculative delay", and entered a decree
dismissing the suit. Plaintiff appeals.

On or about September 5, 1941, the plaintiff, James
W. McIver, and the defendant, William Norman, en-
tered into an agreement of joint adventure to build a
house on a lot in the city of Portland, which Norman
and his wife were purchasing on contract, sell the house
when built and divide the profits. This agreement was

evidenced by a writing signed by the parties on that date, of which the following is a copy:

"This is an Agreement between WILLIAM NORMAN and JAMES W. McIVER:

"WHEREIN they have entered into an agreement for the sole and exclusive purpose and restricted to title holding of a certain piece of property known as Lot I and the westerly fifteen (15) feet of Lot Two (2) in Block Two (2), situated in Arlington Heights, City of Portland, Oregon;

"WHEREIN said parties are to share equally in the profit or loss resulting from the sale of a residence to be constructed on said property by EQUITABLE SERVICE INC., said profit shall be the net return after payment of $500.00 for the property, after payment of a fee of $500.00 to EQUITABLE SERVICE INC. for the construction of and supervision of construction of said residence, and after the payment of the actual cost of construction and any sale or loan costs incidental to the construction and sale of the aforementioned residence.

"Mutually agreed to and signed this 5th day of September, 1941, Portland, Oregon."

McIver's business was building homes. He operated through Equitable Service, Inc., a corporation (hereinafter called Equitable), which, under the terms of the above agreement, was to construct the residence in question. McIver and his wife were the principal stockholders in this corporation at the time the agreement was entered into; by March, 1942, they were the sole stockholders and McIver at all times controlled the corporation. Norman was an employee in the building permit department of the city of Portland.

To finance the project McIver arranged for a $5,000.00 construction loan from First Federal Savings & Loan Association, secured by a mortgage on the lot

which was executed by Mr. and Mrs. Norman. The Normans and McIver signed the note. Payments of principal and interest on the note in installments of $34.90 each were to commence in March, 1942. These documents are dated October 3, 1941.

Equitable (which was at the time building several other houses for McIver) commenced the work of construction shortly thereafter, and by June, 1942, had brought the house to approximately ninety-eight per cent completion. In the meantime differences had arisen between the partners, mainly, it would appear, because of McIver's failure to pay his share of the monthly installments on the mortgage. The loan company wrote letters to the parties threatening to foreclose. The last of such letters was written on June 4, 1942, demanding payment of $125.43, then delinquent. Norman refused to sign vouchers authorizing First Federal to make further payments out of the mortgage fund for materials and labor, and Equitable quitted the job early in July. Norman then undertook completion of the house himself, and the loan company paid out further sums both for work previously ordered by Equitable and presently ordered by Norman. On September 1 the sum of $8.62 remained in the loan account. The house was still unfinished.

Sometime in August Norman asked permission of McIver to look at Equitable's records. The actual cost of building the house was exceeding the previously estimated cost, and it was apparent that the loan would not cover such cost, and Norman suspected that improper charges had been made by Equitable. McIver readily complied with Norman's request, and Norman, from the records and from other sources, prepared a detailed statement of the costs of the job. In this state-

ment corrections were made of what Norman claimed to be errors shown by Equitable's records. For illustration, Norman claimed that certain lumber appearing by these records to have been charged to the joint adventure was actually delivered to another house that McIver was building.

The net result of this computation was that, according to Norman's view, Equitable had been overpaid $452.10, and had not been paid $296.43 to which it was entitled. On September 1 Norman delivered a copy of this statement to McIver with a letter signed by Norman and his wife, and reading as follows:

"In regards to a settlement of our written agreement for your portion in building 3040 S. W. Cascade Drive, which states that you were to receive a fee as your only profit for such service aside from that which may be derived from its sale and further that we each were to share alike in the profit or loss until such time as this residence would be sold, therefore taking into consideration the following:—

"1. The job being started Oct. 7th. 1941 and still not finished by June 1942 or a period of 9 months.

"2. Having had to finish the job that you contracted to perform.

"3. Having found irregularities in bills presented me by you and paid by me.

"4. Having had to pay your share of Mortgage and Interest payments in order to keep the above dwelling out of litigation in respect to foreclosure.

"I find in weighing the above facts, and feeling that I have been most lenient in already having made your share of five (5) monthly Mortgage and Interest payments, I find it necessary to hereby notify you that I do not intend to make any further payments for you. The August payment as you know is now past due. If your share is not paid by

Sept. 10th, 1942, along with $125.40 due me for Mortgage payments already made by me for you, and if such payments are made by you, if any following payments should lapse over 30 days from date due, I shall consider this as your intention for breaking all agreements signed by us.

"If you should fail to make any of these payments, I agree to pay you for your partial services in building this residence, Two hundred and Fifty Dollars ($250.00), providing overpayments made to you (figured on the basis of all bills and labor presented me by you) are used to pay outstanding bills as itemized in enclosed statement of account.

"I will assume the unpaid Linoleum bill of $120.57."

McIver never answered the letter in writing. He testified that he told Norman that the account was grossly in error. In the meantime (exactly when it is not clear) Norman had made up the delinquent payments on the mortgage and put it in good standing. Norman proceeded with what remained to be done in the building of the house at a cost of $198.00 or more over and above the amount of the mortgage loan.

On September 9 Equitable filed with the county clerk of Multnomah County its notice and claim of lien against the property for $1,090.37, made up of $585.37 balance due for labor and material, $500.00 fee for services, and $5.00 statutory filing fee. The notice was signed and sworn to by McIver as president of the corporation. At that time there were of record and unpaid two other mechanic liens against the property totalling $377.00. McIver testified that the filing of the lien notice "wasn't directed at the joint enterprise but it was more directed to protect against the mortgage company filing a foreclosure suit in view of their position which I felt was very unfair at the time." He

testified before this, however, that while he knew First Federal had threatened to foreclose, he "was satisfied they wouldn't."

In the meantime both parties, by newspaper advertising and otherwise, made efforts to sell the house. McIver testified that he communicated to Norman an offer which he had received of $7,600.00, $200.00 down with the balance payable in a year, but that Norman rejected it because he wanted a substantial down payment. Norman at first fixed the selling price in his newspaper advertising at $7,950.00; he finally went as low as $6,800.00. The last of Norman's ads was published on October 18, 1942. The market was not good and no sale was made.

On several occasions in October McIver asked Norman "to get together and settle this thing and get it out of the way." Norman would respond by telling McIver to see his attorney. McIver heard that Norman intended to occupy the house himself, and on October 23 mailed him a letter of which the following is a copy:

"Referring to our partnership concerning the residence known as 3040 S. W. Cascade Drive, I wish to inform you that there is a sale impending that involves a small down payment at this time and an outright purchase as of February 1, 1943, in the amount of $7600.

"The Electric Company advises me that it was their understanding that you were going to occupy the house. This is quite contrary to our agreement, and I wish to take this opportunity and this means to definitely protest any such action on your part as it would, first, markedly depreciate the value of the house, and it might also so seriously injure the property that it would prevent its sale at any reasonable figure. Further, it might also present a problem to you that at the time of the sale, you .

might find it difficult to find living quarters, yourself.

"It is my suggestion that we place the house in the hands of some responsible real estate firm or broker and request that they sell it at the best price obtainable.

"I am so determined that you should not occupy the house that in the event that you do, I will file a suit for the dissolution of our partnership directly thereafter and request that a receiver be appointed and an accounting made, and the house sold by said receiver.

"Please give this your earnest consideration before taking such a drastic action as to occupy the premises yourself."

Norman did not admit receiving this letter. Neither did he deny it, and we think the weight of the evidence shows that he received it. He admitted that McIver protested against his occupying the premises. On November 3 Norman moved into the house and has occupied it as his home ever since. On November 10 he and Mrs. Norman filed a suit against Equitable to secure a decree cancelling Equitable's notice and claim of lien. Equitable defaulted, and the court on December 8 entered a decree of cancellation, pursuant, however, to an oral out-of-court stipulation of counsel that such decree was to be taken "with no costs and no determination of the contractual obligations between the parties." McIver, in his testimony, interpreted this stipulation to apply to his rights, whatever they might be, as well as Equitable's and the Normans', and he was not contradicted. Thereafter, there were no communications between McIver and Norman until this suit was commenced on December 13, 1945.

In January, 1943, Norman arranged for the refinancing of the First Federal Loan. The original note

and mortgage were satisfied, and Mr. and Mrs. Norman executed a new note and mortgage for $5,000.00. McIver was not notified of this transaction.

So far as the record discloses, McIver has made no payments on the mortgage indebtedness. As a witness he sought to justify his failure to pay his one-half during the time that the house was under construction by the claim that he had put more money into the enterprise than Norman. According to his testimony, this came about in the following manner: He made an advance of $1,000.00 to Multnomah Housing Corporation, a subcontractor on the job. This company belonged to McIver's brother. Multnomah Housing Corporation was at the time engaged in doing work on another of McIver's houses, and the $1,000.00 was advanced to it generally to enable it to pay its bills. Equitable was not in funds, and $585.00 of the $1,000.00 was accounted for as a payment by Equitable to Multnomah Housing Corporation for labor on the joint adventure house. (The item appears in the lien above referred to as "Balance due for labor and materials.") By this method, which McIver termed a "short cut", he paid Equitable's debt to Multnomah Housing Corporation. The loan company, it appears, refused to honor vouchers for these expenditures, and McIver took the position that this action was unfair to him and, further, as stated, that he had already put more money into the joint adventure than had Norman, and, therefore, that he was justified in refusing to make payments on the mortgage. He did not testify that he ever made any such explanation to Norman, and Norman testified, in answer to a question as to whether he had ever had a conversation with McIver about paying his half, "No, I don't believe he ever said that he wasn't going to

pay it. He was notified and I expected that he would pay it, but they never were paid.''

Early in January, 1943, Martin T. Morlan, a plumber who had done work on the house and had not been paid, tried to collect his bill from McIver. As a witness for the defendant Morlan testified that McIver told him ''I have nothing at all to do with that house. That house belongs to Norman and I have nothing to do with it whatsoever; so you will have to get your money from Mr. Norman.'' McIver denied this, but the Circuit Court accepted Morlan's testimony and we shall do likewise. Morlan further testified that he told Norman of the conversation.

According to McIver, the entire cost of the house to Equitable, including its fee of $500.00, was $6,200.00. At the beginning it was estimated that the house as then planned would cost $5,158.00. This estimate later was found too optimistic; it was revised; some rooms were eliminated, and a new estimate of $5,674.00 made. It was stipulated at the trial, which was held in February, 1947, that the property at that time was worth between $10,000.00 and $15,000.00.

As stated, this suit was not commenced until December 13, 1945, approximately three years and one month after Norman took possession of the house. McIver was asked on cross-examination the reason for the delay and answered:

''The reason that I didn't was that it costs money to bring litigation, and there was enough trend in the market that by waiting it wasn't going to hurt my position any. I felt that to wait any longer it would, and I thought the house should be sold as quick as possible.

\* \* \*

"Q You were waiting to see what the market would do?

"A From the standpoint of filing the suit, yes."

LUSK, C. J.

The parties are agreed that the relationship created by their contract was one of joint adventure. See *Keiswetter v. Rubenstein,* 235 Mich. 36, 209 N. W. 154, 48 A. L. R. 1049, with annotation at p. 1053. The rights and duties of coadventurers are essentially those which pertain to a partnership. *Walls v. Gribble,* 168 Or. 542, 545, 124 P. (2d) 713; *Elliott v. Murphy Timber Co.,* 117 Or. 387, 394, 244 P. 91, 48 A. L. R. 1043. Their relationship is fiduciary in character and imposes upon the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness and honesty in their dealings with each other with respect to the matters pertaining to the enterprise. This is especially true of those to whom the conduct of the enterprise or the property involved therein is entrusted. Such a party will be regarded as a trustee and will not be permitted to enjoy any unfair advantage because of his possession or control of the joint property. *Walls v. Gribble,* supra; *Thimsen v. Reigard,* 95 Or. 45, 54, 186 P. 559.

The relief sought by the plaintiff is of the type commonly awarded in proceedings to wind up a partnership. He asks that the joint adventure be dissolved; that an account be taken; that the defendant pay to him what is found to be his due; that a receiver be appointed to collect moneys due the joint adventure and to collect the fair rental value of the dwelling from the defendant during the period of his occupancy; and that the property be sold and any profit derived from the sale be distributed equally between the parties.

The grounds of defense, as stated in the defendant's brief, are threefold, to-wit: That the plaintiff is not entitled to an accounting, first, because he abandoned the joint adventure; and, second, because he has already been given an accounting to which he made no specific objection; and, third, that the plaintiff is barred from equitable relief because of laches in commencing the suit coupled with an intent to speculate and gamble on his partner's credit.

Before discussing these questions we think it well to determine whether, for the purposes of this case, Equitable and McIver are to be regarded as one and the same legal person; or, in other words, whether the corporate entity is to be ignored. McIver and his wife became owners of all the stock of the corporation early in 1942, and McIver at all times controlled it. Under the terms of the contract the corporation was to construct, and supervise the construction of, the residence for a fee of $500.00. On the trial and here the plaintiff has contended that it was error to admit testimony "in disregard of the corporate entity of Equitable Service, Inc. and to charge its alleged fault to the plaintiff". We see no error in the ruling and are of the opinion that as between the parties to this suit McIver was the corporation and the corporation was McIver. Not only does Norman claim this by laying the corporation's alleged derelictions at the door of McIver, but McIver does likewise by taking to himself credit for the corporation's good deeds. For example, he says in his brief that *he* brought the house to "occupiable completion", although this was supposed to be the undertaking of the corporation.

While, for all ordinary purposes, a corporation is regarded as a legal entity separate and distinct from

its stockholders, yet, as Judge Sanborn said in *United States v. Milwaukee Refrigerator Transit Co.*, 142 Fed. 247, "when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons." See *Security Savings & Trust Co. v. Portland Flour Mills Co.*, 124 Or. 276, 288, 261 P. 432.

In view of the fiduciary relation between the parties, it would be an obvious fraud upon Norman, if, as he asserts, erroneous or fabricated charges were made against the joint adventure by Equitable, to permit McIver to escape responsibility for such delicts by shielding himself behind the corporate form. On the other hand, since Norman insists upon this view of the matter where it is to his interest to do so, it would be grossly inequitable, in considering Norman's contention that McIver had failed in his obligations to the joint adventure and that he was justified for that, among other reasons, in excluding McIver from participation in its profits, to say that credit for the corporation's contribution to the enterprise is to be withheld from McIver. We shall, therefore, in our discussion of the case, treat McIver and Equitable as one and the same person.

On the question of abandonment it is the defendant's position, as stated in his brief, that "McIver, by filing the lien and by remaining silent for three years following the judgment cancelling the lien completely abandoned any interest he may have had in the joint venture." We cannot agree. The venture had a two-fold purpose: To build the house and to sell it at a profit. At the time of the alleged abondonment the first objective had been practically attained; the other

was not attained for reasons over which neither party had control. McIver then had a fixed and certain interest, and, even though he had been guilty of breaches of duty which made him liable to a claim for damages, he could be neither excluded from the right to participate in the fruits of the venture by unilateral action on the part of Norman, nor be held on doubtful evidence to have forfeited that right of his own free will.

 Abandonment is a voluntary thing, and there must be a clear, unequivocal and decisive act of the party to constitute abandonment in respect of a right secured. *Dobert v. Ukase Investment Co.,* 139 Or. 626, 10 P. (2d) 356. See, *Loeb v. Merges,* 110 Or. 174, 220 P. 572; *Wilson v. Colorado Mining Co.,* 227 Fed. 721, 725 (C. C. A. 8th). No such act of McIver's is shown. He did not abandon the enterprise by quitting building operations in June, 1942, when Norman refused to sign further vouchers for the cost of labor and materials. His act is verifying and filing Equitable's lien may be criticized as inconsistent with the duty of loyalty he owed to his partner, but it is far from conclusive evidence of abandonment. On the other hand, there was a continuous insistence on his part upon his rights as a joint adventurer up to October 23, 1942, when he wrote the letter warning Norman not to occupy the house and threatening to sue for dissolution of the partnership. By moving into the house and attempting to take to himself the entire fruits of the adventure Norman violated the fiduciary duty owing from one partner to the other. Thereafter it was not necessary for McIver to continue to proclaim his rights in order to preserve them. He might have lost them by laches, but that is another question. His statement to Morlan, the plumber, evidently made to avoid annoyance about an

unpaid bill, is hardly to his credit. But an untrue statement of this kind to a third party is not enough on which to base a finding of abandonment in the face of the overwhelming evidence to the contrary. The burden of proof on this question was on the defendant and has not been sustained.

Even though the things that were done resulted in a dissolution of the joint adventure it would still continue in existence for the purpose of winding it up and an accounting, and McIver would not be deprived of his right to participate in the profits, if any there were. *Carrey v. Haun*, 111 Or. 586, 594, 227 P. 315, and cases there cited. The real issue, in our opinion, is whether McIver was guilty of such grave breaches of his obligations as a partner as to justify Norman in his attempt to exclude McIver from his right thus to participate. The law applicable to this question is well stated in *McDonough v. Saunders*, 201 Ala. 321, 78 So. 160, 11 A. L. R. 419. The court there was dealing with a partnership having three members, two of whom attempted to oust the third. The court said, after referring to the rights of the parties on dissolution:

> "There seems, however, not to have been any desire or attempt on the part of any of the joint adventurers to dissolve this partnership of joint adventure. The desire and attempt was to continue the joint adventure to consummation, but to exclude complainant from membership in the firm. It is certain that he never attempted to dissolve it or to retire, and the evidence fails to convince us that he was ever guilty of such faults, wrong, or neglect as to forfeit his rights to participate in the joint adventure to the end or consummation thereof. There is, however, no such right in a member, or even a majority of the members, to expel one or more members at will as there is to dissolve the partnership. The

two things are entirely different. In the absence of an express agreement to that effect, there exists no right or power of any members, or even a majority of the members, to expel or eliminate all other members from the firm at will. Nor can they at will forfeit the share or interest of a member or members, and compel him or them to quit the firm, even on paying him what is due him. It is not every dereliction of a member, such as a failure to pay his part of the expenses, or to promptly and faithfully perform his part of the services agreed to, which will ipso facto forfeit his right, or even authorize a court of chancery to forfeit his right, to the common property or assets of the partnership. There may be, however, extreme and gross faults which would work a forfeiture, especially where there was an extreme emergency for him to perform his part, and to be prompt and faithful. Kimball v. Gearhart, 12 Cal. 27, 1 Mor. Min. Rep. 615; Piatt v. Oliver, 3 McLean, 27, Fed. Cas. No. 11,116; Gorman v. Russell, 14 Cal. 531.

"Courts of equity abhor forfeitures, and will never enforce them unless necessary to enforce the law and to do justice between the parties. It is not every fault, failure, neglect, or dereliction on the part of a member that will justify a dissolution of the partnership, much less an expulsion of a member, as was attempted in this case."

The same doctrine is thus expounded in *Kaufman v. Catzen,* 81 W. Va. 1, 94 S. E. 388:

"The contract between them was not an entire working contract, made between persons sustaining no fiduciary relation. It was a joint enterprise to be conducted by both of them, wherefore failure of either fully to perform his part did not forfeit his fully acquired interest. Notwithstanding defaults and omissions, each has an interest in such assets as have been preserved or accumulated. * * * Kaufman's default may have conferred right upon

Catzen to sue him either for contribution or reimbursement for funds advanced, or damages for breach of the contract. * * * But, after an investment has been made and valuable property acquired by the use of the funds of an adventurer or partner, his coadventurer or copartner cannot wholly exclude him from enjoyment thereof, or forfeit his title or right for failure to comply with the terms of his agreement.''

Other cases supporting these principles will be found in the annotation to *McDonough v. Saunders,* supra, 11 A. L. R. 432. Included in the annotation are a few cases in which the facts were such that the court felt justified in declaring that the delinquent partner had forfeited his rights as such. But counsel for the defendant have cited no case, and we have found none, in which that result was reached under a state of facts parallel to those of the instant case. Here, as stated, the undertaking of the coadventurers was to build a house, and, if possible, sell it at a profit. The project had to be financed and McIver arranged for that. He made himself equally liable with Mr. and Mrs. Norman on a promissory note for $5,000.00. He nearly completed the house, and, for all that anyone knows, would have completed it but for Norman's interference by refusing to sign further vouchers. His services were his contribution to the firm's capital.

Against this record in his favor may be placed the following alleged faults: His refusal to pay his share of the installments coming due on the mortgage indebtedness; his mixing up of the accounts of Equitable against the joint adventure's dwelling with the accounts applicable to other houses he was building, and possible overcharges against the joint adventure; and the filing of Equitable's lien against the property. In addition

to the foregoing, complaint is made in the defendant's briefs because McIver underestimated the cost of building the house and was too slow with the work and kindred matters, none of which can be put down to anything more culpable than errors of judgment or inefficiency. They do not call for discussion.

There was probably carelessness in keeping the accounts, although it would be difficult to say that the joint adventure suffered as a result, for practically no books or records were produced at the trial and all depends upon assertion of the witnesses. In any event, there is no evidence of intention on the part of McIver to cheat his partner. In refusing to make payment of one-half of the installments on the mortgage indebtedness as they fell due, we think McIver was wrong, although we think that the reasons he gave for his refusal were honestly held, and that his contention that he had overpaid the enterprise through an advance to Equitable was made in good faith. The validity of that claim, however, as well as the facts about other disputed items in the account, we leave to be determined on the remand. McIver was also wrong and failed in his duty to his partner in causing the lien notice to be filed. We are not impressed with his explanation of his motive in this regard. A fair appraisal of that incident would be that his real purpose was to protect himself. Other mechanics' liens had been filed, it was doubtful whether the house could be sold at the time for what it had cost to build, and Norman had taken the drastic steps of attempting to oust McIver from all participation in the joint adventure and to cut in half the fee agreed to be paid to Equitable. In this situation McIver, probably in a quandary as to his legal rights and uncertain about the

practical consequences if there should be litigation between the partners, caused the lien to be filed, for the apparent purpose of casting an anchor to windward. It was a mistaken act, and, as he himself admitted on the stand, inconsistent with his position as a member of the joint adventure. But it resulted in no harmful consequences to the firm, and it would be harsh and inequitable to hold that it worked a forfeiture of McIver's rights.

We hold that McIver neither abandoned his rights in the joint adventure, nor lost them through breaches of duty to his coadventurer.

We come to the question of laches.

It is well established that not delay merely, but delay which works injury to another, is such laches as will prevent a party from obtaining relief in a court of equity. *McKinnon v. Bradley,* 178 Or. 45, 165 P. (2d) 286; *City of Pendleton v. Holman,* 177 Or. 532, 547, 164 P. (2d) 434, and Oregon cases there cited. "The test is not time", said Circuit Judge Kenyon in *Mason v. MacFadden,* 298 Fed. 384, 391 (C. C. A. 8th), "but whether the situation of the parties is so changed as to render prosecution of a suit inequitable, and this test has been adopted by the courts in the majority of cases dealing with the subject."

Each case must be decided on its own circumstances. *Mays v. Morrell,* 65 Or. 558, 564, 132 P. 714. The doctrine is "not arbitrary as statutes of limitation are, but founded on justice and flexible in its application." *Taylor v. Salt Creek Consol. Oil Co.,* 285 Fed. 532, 536 (C. C. A. 8th). "The doctrine is not applied mechanically and to every situation where there has been any neglect at all, but each case must stand on its

own facts in that regard." *Troll v. City of St. Louis,* 257 Mo. 626, 661, 168 S. W. 167.

The opinion of Circuit Judge Kenyon in *Taylor v. Salt Creek Consol. Oil Co.,* supra, contains an elaborate discussion of the subject with a review of many federal decisions. At p. 539 he says: "Many elements bear upon the question of due diligence in prosecuting; such, for instance, as the nature of the property in dispute; the nature of the remedy; the kind of agreement sought to be enforced; the nature of the relief demanded." It was held in that case that where a party seeks to impose upon another a constructive trust arising out of a parol contract the rule as to diligence is applied with strictness. So, in *Loomis v. Rosenthal,* 34 Or. 585, 600, 57 P. 55, this court referred with approval to the holding of *Badger v. Badger,* 69 U. S. (2 Wall.) 87, 17 L. ed. 836, "that courts of equity, acting on their own inherent doctrine of discharging, for the peace of society, antiquated demands, refuse to interfere in attempts to establish a stale trust, except where (1) the trust is clearly established, and (2) the facts have been fraudulently and successfully concealed by the trustee from the knowledge of the *cestui que trust.*"

On the other hand, where fraud was clearly established it was held that lapse of time was not controlling. *McIntire v. Pryor,* 173 U. S. 38, 43 L. ed. 606, 19 S. Ct. 352. See, also, *Allore v. Jewell,* 94 U. S. 506, 24 L. ed. 260.

■■ Another well-recognized rule is that in cases of this kind courts of equity act by analogy to the statutory limitations of actions at law, and hold that when suit is brought within the time fixed by the analogous statute the burden is on the defendant to show the

existence of the circumstances amounting to laches, whereas, if the suit is brought after the statutory time, plaintiff must plead and prove that laches does not exist. *Nelson v. Baker,* 112 Or. 79, 97, 227 P. 301, 228 P. 916; *Baillie v. Columbia Gold Mining Co.,* 86 Or. 1, 23, 166 P. 965, 167 P. 1167; *Wills v. Nehalem Coal Co.,* 52 Or. 70, 90, 96 P. 528. Here the analogous statutory limitation is § 1-204, O. C. L. A., providing that actions on contract must be brought within six years after the accrual of the cause of action. The present suit was brought about three years after the accrual of the cause of suit, and the burden of proof, therefore, on this question is upon the defendant.

As stated by Judge Kenyon, the nature of the property in dispute is an element bearing upon the question of due diligence. The defendant says that the property here involved is speculative in character, and, as the stipulation of the parties shows, has increased greatly in value between the latter part of 1942 and December, 1945, when the suit was filed; that McIver waited to see whether it would be worth his while to assert his alleged rights, speculating on this possible change in value and in the meantime permitting Norman to carry the indebtedness. It is, therefore, argued that he should be barred from equitable relief under what has been sometimes referred to as the doctrine of "speculative delay". The rule in this regard is stated in 30 C. J. S., Equity, 541, § 118:

> "*Change in value.* A marked appreciation or depreciation, according to the circumstances, in the value of the property involved, where the right might have been asserted before such change, and the granting of relief would in consequence of the change work inequity, is ordinarily fatal to plaintiff's case. A person may not withhold

his claim, awaiting the outcome of an enterprise, and then, after a decided turn has taken place in his favor, assert his interest, especially where he has thus avoided the risks of the enterprise. Accordingly, if the property involved is of a speculative or fluctuating character, more than ordinary promptness is required of a claimant; he must press his claim at the earliest possible time. This rule is applied with great strictness in the case of oil or mining property, since it is of a specially precarious nature, and is exposed to the utmost fluctuations in value."

The foregoing rule is but a particular application of the general principle that only delay which works injury to another is laches. One of its elements, as the quoted text says, is that "the granting of relief would in consequence of the change work inequity". There are many cases in the books involving oil and mining properties in which delay, accompanied by change in value, has been held to bar relief. The Supreme Court of the United States has said: " * * * persons having claims to such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced." *Patterson v. Hewitt,* 195 U. S. 309, 321, 49 L. ed. 214, 25 S. Ct. 35, 38. The Supreme Court thus explained the reasons for this rule in *Twin-Lick Oil Company v. Marbury,* 91 U. S. 587, 592, 593, 23 L. ed. 328:

"The fluctuating character and value of this class of property is remarkably illustrated in the history of the production of mineral oil from wells. Property worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for a thousand dollars as its fair value may, by the natural changes of a week or the energy and courage

of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit.''

See, also, *Taylor v. Salt Creek Consol. Oil Co.,* supra, and *Mason v. MacFadden,* supra. Of this class of cases is *Livermore v. Beal,* 18 Cal. App. (2d) 535, 64 P. (2d) 987 (Cert. den. 302 U. S. 712, 82 L. ed. 550, 58 S. Ct. 32, cited by the defendant. Under that title are reported four cases which were actions to quiet title to oil and gas lands. They were decided on demurrer, the court holding both that the complaints were insufficient and that the actions were barred by laches. The delay in bringing suit appears to have been more than eight years, and as to this the court said: `` * * * one is not permitted to stand by while another develops property in which he claims an interest, and then, if the property proves valuable, assert a claim thereto, and, if it does not prove valuable, be willing that the losses incurred in the exploration be borne by the opposite party.''

The only other case cited by the defendant in support of his position on this question is *Bower v. Stein,* 177 Fed. 673 (C. C. A. 9th), which was a suit to vacate a decree of foreclosure of a mortgage on real property brought nine years after the plaintiff (the mortgagor) was charged with knowledge of the foreclosure suit and seven years after she had actual knowledge of the sale. The court held on demurrer that the suit was barred by laches. It appeared from the bill that the complainant had no defense to the foreclosure suit, that the defendant in the suit to vacate the decree was

a third party who had purchased the property from the purchaser at the sheriff's sale, and that the property had doubled in value since then. The basis for the relief sought was fraud in the affidavit of publication. But the allegations of fraud were held to be insufficient, and on that ground, as well as the ground of laches, the suit was dismissed.

■ There is no hard and fast rule, however, that delay in prosecuting a suit, accompanied by a change in the value of the property, necessarily constitutes laches, as the cases of *Indiana & Arkansas Lumber Co. v. Brinkley*, 164 Fed. 963 (C. C. A. 8th), and *Wilson v. Colorado Mining Co.*, supra, illustrate. The opinions in both these cases were written by Circuit Judge Walter Sanborn. The former was a suit to remove a cloud from the title to lands which had been sold under proceedings held void for lack of jurisdiction. On the question of laches the court said, after referring to the fact that an action at law would not have been barred by the analogous statute of limitation:

> "The established rule for the administration of the doctrine of laches in equity is that under ordinary circumstances a suit in equity will not be stayed before, and will be stayed after, the time fixed by the analogous statute of limitations at law. But if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. Kelley v. Boettcher, 29 C. C. A. 14, 21, 85 Fed. 55, 62, and cases there cited; Billings v. Smelting Company, 2 C. C. A. 252, 262, 263, 51 Fed. 338, 349; Bogan v. Mortgage Company, 11 C. C. A. 128, 135,

63 Fed. 192, 199. No extraordinary circumstances or unusual conditions, except that between 1895 and 1905 the land increased in value from a few cents to $7 an acre, have been suggested. While a striking change in value is always to be considered, the mere fact that there has been a great appreciation or depreciation after the defendants acquired their claim and before the suit was brought is not ordinarily sufficient, and is not sufficient in this case, to turn aside the ordinary course of judicial proceedings. There are no rights of innocent purchasers, no expensive improvements made by them in reliance upon their purchases, no loss of muniments of title to appeal to the conscience of a chancellor, and the complainant's equitable right to remove the cloud he assails has not been lost by laches.''

The case of *Wilson v. Colorado Mining Co.* was a suit to establish complainant's rights in stock, and the dividends thereon, of a mining corporation. Again, the suit was brought within the period of the analogous statute of limitations, and the court held that, notwithstanding an increase in the value of the stock, there was no laches, substantially for the reasons stated in *Indiana & Arkansas Lumber & Mfg. Co. v. Brinkley.* A similar holding is found in *Miller v. Walser,* 42 Nev. 497, 181 P. 437, another case involving a mining property.

Since the cases involving the doctrine of laches are so numerous and the decision in each case turns on its own peculiar facts, it would be profitless to attempt a further review of them or to search for precedents in which the controlling facts are similar to those with which we are now dealing. We have examined many decisions where the element of change in value was present and the suit was held to be barred

by laches. In all of them are to be found one or more of the additional elements referred to in the opinion of Judge Sanborn from which we have quoted; or, if not, it was apparent that to grant the relief sought would be unjust to the defendant—an injustice arising by reason of the change in value of the property. A few such cases are cited as illustrative. *Akley v. Bassett,* 68 Cal. App. 270, 228 P. 1057; *Horn v. Hull,* 169 Ark. 463, 275 S. W. 905; *Breit v. Bowland,* 231 Mo. App. 433, 100 S. W. (2d) 599; *McNair v. Sockriter,* 199 Ia. 1176, 201 N. W. 102.

Our conclusion is that this suit is not barred by laches, for the following reasons: It was commenced within the period of the analogous statute of limitations; unlike a belated attempt to establish a constructive trust based on a parol agreement, or other cases of that character, it is founded in a written contract creating a fiduciary relationship, and in satisfactory evidence of substantial performance of the plaintiff's obligations under that contract, from which springs a fixed right in the subject matter of the joint adventure; it is founded further in clear proof of an attempt on the part of the defendant to exclude the plaintiff, over the latter's remonstrance, from the enjoyment of his right; no rights of third parties have intervened; there is no suggestion of loss of evidence on account of the delay; there is no suggestion that defendant has actually been injured by the delay. On the contrary, there can be no question but that the defendant as well as the plaintiff has benefited, for, had suit been commenced before appreciation in the value of the property and a receiver appointed and the property ordered to be sold, it is very doubtful whether either party would have gained anything ex-

cept experience in the luxury of litigation. The defendant has made no improvements of any moment since taking possession of the house. The increase in value was not due to his efforts, but to the effect of the war on property values in Portland in general. The plaintiff was not waiting while the defendant created value where there was none before. The defendant, it was true, did assume the burden of the debt during the intervening period. But, it may be reasonably assumed that the monthly installments required to be paid on the new mortgage which he negotiated would not have exceeded in amount half the rental value of the dwelling. As to this, the case is like those in which the courts have held that weight should be given to the fact that the cost of improvements made by the defendant was less than the rental value of the land. *Allore v. Jewell,* supra; *Black v. Baskins,* 75 Ark. 382, 387, 87 S. W. 647; *Peabody v. Burri,* 255 Ill. 592, 603, 99 N. E. 690; *Hinds v. Surbeck,* 260 Ill. 606, 611, 103 N. E. 599. In a word, although there has been delay in prosecuting the suit, the defendant has suffered no injury as a result of the delay, and hence the claim of laches must fail.

■ There remains for consideration only the defendant's contention that an account should not be taken because he has already rendered an accounting. We think that the point does not call for extended discussion. It is doubtful whether the statement given to McIver by Norman on September 1, 1942, could properly be called an accounting. At any rate McIver did not acquiesce in it. And, even though it could be said that this so-called accounting bound McIver so far as it went, it could have no bearing on the main issue, namely, whether McIver has forfeited his right

to share in the fruits of the joint adventure. We hold that he has not and that there should be an accounting such as is usual in proceedings to dissolve a partnership.

We adhere to the conclusion reached in our former opinion. The decree will be reversed and the cause remanded for further proceedings in conformity to this opinion. There was fault on both sides which led to this litigation, and neither party, therefore, will recover costs or disbursements.