Argued December 19, 1978, reversed and remanded with
instructions April 23, reconsideration denied June 12,
petition for review denied June 26, 1979

ELSASSER, *Appellant,*
*v.*
M.P.R. CONSTRUCTION CORP., *Respondent.*
(No. A7702-01852, CA 9960)
593 P2d 1218

John M. Berman, Portland, argued the cause and for appellant. With him on the briefs was Dezendorf, Spears, Lubersky & Campbell, Portland.

Howard Hedrick, Portland, argued the cause and filed the brief for respondent.

Before Schwab, Chief Judge, and Thornton, Tanzer and Buttler, Judges.

BUTTLER, J.

## BUTTLER, J.

This suit was brought by Fred Elsasser against M.P.R. Construction Corp. (MPR) to quiet title to certain real property which was the subject of an earnest money agreement between Elsasser as seller and MPR as buyer. MPR filed a counter suit for specific performance of the agreement, which the trial court granted. Elsasser appeals.

The subject of the agreement and of this litigation is a 5.91 acre parcel in the Mt. Scott area of Portland which was part of a larger tract that Elsasser owned, or was acquiring, and for which he had obtained preliminary approval as a Planned Unit Development (PUD). At the time negotiations for the sale of this parcel began, the First National Bank of Oregon held a mortgage on all of Elsasser's Mt. Scott property to secure a loan of $225,000, plus interest.

The defendant, M.P.R. Construction Corp., is wholly owned by John Champagne. On March 23, 1976, Elsasser and Champagne discussed the possible purchase of the parcel by MPR with the understanding that the land was to be subdivided into 18 lots on which MPR would build houses. An "earnest money receipt and sale agreement" was signed on that date (Agreement I), providing for the sale of the land for $100,000. The agreement called for a down payment of $60,000 at closing, the balance to be paid over two and one-half years out of the proceeds from the sale of developed lots. MPR was to qualify for a development loan from Oregon Mutual Savings Bank within 60 days, was to obtain no later than May 18, 1976, all permits and approvals to develop the lots, and was to furnish First National Bank a financial statement so that it could approve or disapprove the transaction. The bank had imposed such a requirement with respect to any transaction other than a cash sale which would result in a release of the property from the bank's mortgage. The closing date of the sale was to be May 29, 1976.

At the same time as Agreement I was signed, the parties entered into a development contract whereby Elsasser agreed to develop or oversee the development of the property (that is, put in streets, curbs and utilities) for the sum of $62,000. That agreement, by its terms, was to be "ratified" by MPR no later than May 30, 1976, if it desired the work to be done by Elsasser. It is disputed whether this agreement was ever "ratified." Champagne testified that the signatures on the agreement at the time of execution constituted ratification, whereas Elsasser contended that a further written ratification was required. It is agreed that no further written ratification was executed.

On May 27, 1976, after Agreement I expired by its terms, the parties executed a second "sales agreement and receipt for earnest money" (Agreement II). Although the parties disagree as to the circumstances surrounding its execution, they agree that it was signed by each of them and was predated March 3, 1976, but that they intended to date it March 23, 1976, the date of Agreement I. Agreement II provided for the sale of the same land for the same price ($100,000), but the terms were changed to cash on closing, with an earnest money deposit of $40,000. MPR was to obtain adequate financing and to obtain final approval for the development of the 18 lots.

MPR did not deposit $40,000 cash; instead, it tendered Champagne's personal note for $40,000 and assigned, as security, his vendor's interest in a land sale contract. Elsasser claimed that he could not accept the note and contract in lieu of $40,000 cash unless it was first approved by First National Bank. Because his loan officer at the bank was then out of town, the parties deposited the documents at a branch office of the First National Bank on the condition that they could not be removed without the parties' mutual consent. They advised the bank that they wanted the documents held over the weekend; however, the documents remained there until trial.

[718]

When Agreement II was executed, the date for "ratification" of the development contract was changed from May 30 to June 30. Elsasser claims the date was changed because there had not yet been a "ratification"; Champagne claims that the date was changed only to reflect the incorporation of the development contract into Agreement II.

As of June 1, Champagne had obtained, as required by Agreement II, a commitment from Oregon Mutual Savings Bank (OMSB) for a development loan of $120,000, the commitment to expire August 2, 1976. First National Bank had agreed to subordinate its prior lien to the OMSB development loan. Notwithstanding the requirement that MPR obtain approval for development of the 18 lots, Elsasser went ahead and obtained all the necessary approvals. He testified that he did so as a courtesy to MPR.

Champagne left on a previously arranged sailing cruise to Alaska on June 22, 1976. Prior to that time, both parties had been proceeding with the transaction; Elsasser was obtaining the necessary approvals for development of the lots so that the sale could close and Champagne was preparing preliminary designs for the houses which he planned to build. Champagne had delayed his departure, but because the approvals required for closing did not appear to be forthcoming soon, he left on his trip, agreeing, however, to fly back from Alaska and close the sale when advised that everything was ready.

On July 25, 26, 27, a number of telephone calls took place between various combinations of Elsasser, Champagne and OMSB. The content of the conversations and their chronological order is a matter of dispute between the parties. Elsasser testified that he wanted Champagne to come back from Alaska, sign the note and mortgage for $120,000 at OMSB, and complete the purchase, but that Champagne decided not to return at that time. Elsasser claims he then contacted OMSB to find out what to do next and was

told that the bank would make a commitment to him for a development loan but Champagne would first have to release his commitment. He then called Champagne, asking him to release his loan commitment so that he could proceed without MPR. Champagne agreed to send the bank his release with a copy to Elsasser, but neither of them received it.

Champagne, on the other hand, testified that when Elsasser called him, he offered to return, sign the documents and pay Elsasser, but Elsasser told him that was not necessary because all of the approvals had not been obtained; instead, he should assign his OMSB commitment to Elsasser and assume the loan upon his return to Portland. Prior to this conversation, Champagne had called the OMSB loan officer and requested an extension on his loan commitment. The loan officer told him the request had to be in writing, so Champagne prepared and mailed such a request. After he had mailed the letter, he talked to Elsasser, who persuaded him to withdraw it and assign the loan commitment to Elsasser. Elsasser purportedly told Champagne that by assigning the loan to him, development of the lots could be commenced sooner and that the assignment would not change the sale transaction. Therefore, Champagne retrieved the letter from the post office before it was dispatched and replaced it with a letter requesting the bank to assign the commitment to Elsasser with the condition that Champagne be able to assume the loan at any time thereafter. That condition was not acceptable to the bank and the assignment was not approved. The bank was unable to notify Champagne of the rejection of the assignment and his loan commitment expired by its terms on August 2. Elsasser then obtained his own loan from OMSB for $120,000, part of which was used to pay the cost of developing the property.

Elsasser testified that, as a result of Champagne's refusal to return to Portland to close the sale, Elsasser believed Champagne was no longer interested in

purchasing the property and the deal was off. Champagne, however, testifed that he was still interested and had assumed the deal was still alive. His testimony was substantiated by the loan officer for OMSB, who testified that Elsasser told him, when he closed Elsasser's loan, that the transaction with Champagne was still open to Champagne when he returned from Alaska.

Champagne returned from Alaska in early September, whereupon he and his wife viewed the property and visited Elsasser at Elsasser's office. During this visit they discussed the project and the transaction, and Elsasser indicated there had been some delay, but they should be "ready to go" in a couple of weeks. Elsasser did not then, or during subsequent conversations, tell Champagne that the deal was off or that he believed that Champagne had abandoned the transaction; nor did Champagne ever ask if the deal was still on or tender payment. Elsasser continued with the development of the lots and, without Champagne's knowledge, negotiated with other purchasers for the sale of individual lots at prices higher than the MPR purchase price. Champagne, on the other hand, inspected the property periodically and continued to prepare plans for the houses he planned to build, but made no apparent effort to close the transaction.

Elsasser completed the lot development in late December, 1976. On January 17, 1977, Champagne visited Elsasser at his office to inquire whether the transaction could be closed. At that time Elsasser told him that the deal was off, that he had arranged to sell the property to another for a higher price. A brief argument ensued and Elsasser ordered Champagne out of his office. The next day, January 18, 1977, Champagne recorded Agreement II, thereby frustrating Elsasser's new sale. Thereafter, this suit was filed.

In its counterclaim for specific performance, MPR alleged the execution of Agreement II, the payment of "the sum of" $40,000, MPR's obtaining financing for

the balance of the purchase price, and its demand on, and refusal by, Elsasser to convey the property. It is alleged further that MPR has been, and still is, ready, willing and able to perform the agreement. Elsasser denied all of those allegations.

■ At trial, each of the parties, without objection of the other, offered evidence which varied substantially from the pleadings. On appeal, Elsasser would have us revert to the pleadings; however, after judgment the variance between pleading and proof is waived unless timely raised. In *Brooke et ux v. Amuchastegui et ux,*226 Or 335, 360 P2d 275 (1961), the Supreme Court said:

"* * * There is no showing that defendants raised the question during the course of the trial, nor does the record reveal that had defendants done so they could have successfully contended that they had been misled or prejudiced in any way. Unless the attention of the court is timely directed to a claim of material variance, the objection is deemed waived. * * *" 226 Or at 339-40.

The trial court and both parties apparently treated the issues as being whether there was an agreement, and if so, what was it, and whether MPR was entitled to specifically enforce it. In so viewing the case, the trial court found that there was an agreement and that MPR was entitled to a decree specifically enforcing it. While we review the record *de novo,* we give considerable weight to the findings of the trial court where, as here, there is direct conflict in the testimony. The trial judge has an opportunity to hear the witnesses and to observe their demeanor and thereby evaluate their credibility. *Larson v. Trachsel,* 282 Or 247, 577 P2d 928 (1978). The trial court apparently concluded that Champagne's recollection of the events surrounding this transaction is the more credible where it conflicts with that of Elsasser. We agree with that assessment of the testimony.

■ Viewing the record in that light, we conclude that in the spring of 1976, the parties formed a valid,

[722]

enforceable agreement, the essential terms of which were:

(1) Elsasser would sell to MPR the 5.91 acres of Mt. Scott property for the sum of $100,000, payable in cash;

(2) MPR would pay Elsasser $62,000 to develop or oversee the development of the land into 18 lots;

(3) Champagne would deposit $40,000 cash in escrow upon execution of the agreement, would pay the remaining $60,000 for the property on closing, and would disburse the $62,000 for the costs of development periodically as that work progressed;

(4) Champagne would obtain a $120,000 development loan from OMSB, the proceeds of which were to be used to pay the costs of development and the balance to be applied on the cost of the land;

(5) Closing of the transaction would occur when the loan and all of the permits and approvals necessary for the development had been obtained.

This agreement was modified subsequently by the words and conduct of the parties as follows:

(1) Elsasser would obtain the $120,000 development loan with the real property as security, and would proceed with the development work;

(2) The costs incurred by Elsasser in obtaining and carrying this loan would be added to the total transaction price ($162,000);

(3) Champagne would deposit his $40,000 demand promissory note secured by an assignment of his vendor's interest in a land sales contract into escrow in lieu of the initial cash payment required by the agreement, the note to bear interest at 9 1/2 percent per annum from June 1, 1976;

(4) Closing would occur when the development work was complete;

(5) Champagne would assume or pay off the $120,000 OMSB note and mortgage and would receive an offset of the amount so assumed or paid from the total price.

As indicated, the agreement as modified resulted from the statements and conduct of the parties. Elsasser never rejected the $40,000 note delivered by

[723]

Champagne in lieu of the $40,000 cash payment. Both parties proceeded as if the development contract were a part of the overall transaction. The shifting of the OMSB loan was done for convenience. Elsasser led Champagne to believe reasonably that closing would take place when the development work was complete. Having lulled Champagne into so believing, Elsasser may not now take advantage of the inattention of the purchaser. *County of Lincoln v. Fischer et al,* 216 Or 421, 339 P2d 1084 (1959). The record does not bear out Elsasser's contention that MPR abandoned the agreement; for there to be an abandonment, there must be some clear act by Champagne indicating an intent to do so. *McIver v. Norman,* 187 Or 516, 205 P2d 137, 213 P2d 144 (1949), 13 ALR2d 749 (1950). Champagne's behavior evidences the opposite of an intent to abandon; he made regular inspections of the property, he kept in contact with Elsasser, and he proceeded with his efforts to obtain financing and plans for the houses he intended to build on the lots.

■ While Champagne testified that his understanding of the parties' agreement was that outlined above, the more difficult question is whether MPR has alleged and proved that it is ready, willing and able to perform MPR's obligation under the agreement. It is clear that MPR did not tender full performance prior to the litigation,[1] but that tender might be excused because of Elsasser's repudiation of the agreement. *Gaffi v. Burns,* 278 Or 327, 563 P2d 726 (1977); *Percy v. Miller et al,* 197 Or 230, 251 P2d 463 (1952). Notwithstanding that excusable failure, one seeking specific performance must at least show that he is ready, able and willing to perform his obligations in their entirety. *Gaffi v. Burns, supra.*

---

[1] By letter of January 25, 1977, MPR did advise Elsasser it was "ready, willing and able to purchae according to the terms of the earnest money agreement dated March 23, 1976," the property described therein. We construe this letter as tendering payment of $60,000; clearly it was not an offer to pay the development and other costs established at trial as being a part of the agreement, as modified.

■ Champagne's testimony falls short of that mark. He testified that he was prepared to pay $162,000 at the "time of closing," whenever that might have been. He did not testify that he is now, or at any time was, ready, willing and able to pay $162,000, plus loan costs incurred by Elsasser, interest on the loan obtained by Elsasser or interest on the $40,000 note from June 1, 1976.

Accordingly, we hold that MPR was not entitled to a decree of specific performance. It follows that MPR has no interest in the real property, and therefore Elsasser is entitled to a decree quieting title to the property in him free of any claim of MPR.

■ It remains to be considered whether MPR is entitled to the damages it claims in its second counterclaim. MPR's theory appears to be that it, in reliance on the agreement, incurred certain expenses, and Champagne devoted substantial time, all to the benefit of Elsasser. As a result, it is claimed, Elsasser has been unjustly enriched. The evidence is meager at best; there is testimony that MPR spent "several hundred dollars," but it is not specified exactly how much or for what; there is no evidence that time spent by Champagne benefitted Elsasser; there is evidence that MPR agreed to pay Champagne's brother $5,000 for plans of houses MPR hoped to build, but no evidence that the expenditure benefitted Elsasser. In short, the record does not support the claim as alleged.

The trial court awarded MPR attorney fees of $6,000 plus costs. In light of our disposition of this case, MPR is entitled to neither.

We reverse the decree of the trial court and remand for the entry of a decree quieting title to the real property in Elsasser.

Reversed and remanded with instructions.