VAN STEE *v.* RANSFORD.
BLOOM *v.* SAME.

1. TRUSTS—FIDUCIARY DUTY OF MANAGER—PARTNERSHIP—JOINT
   ADVENTURES.
   The fiduciary duty of the manager of an enterprise who was
   also a part owner thereof is the same whether it be named a
   partnership or joint adventure, and he may not enrich him-
   self at the expense of his fellows.

2. SAME—JOINT ADVENTURES—PARTNERSHIP.
   The manager of a joint adventure or partnership who was as-
   sociated therein by employees of the company of which he
   was president was under a duty in his performance to match
   in scruple and sensitivity the confidence reposed in him.

3. JOINT ADVENTURES—LOYALTY.
   Joint adventurers, like copartners, owe to one another, while the
   enterprise continues, the duty of the finest loyalty.

4. SAME—FIDUCIARY RELATION OF JOINT ADVENTURERS.
   Joint adventurers stand in a fiduciary relation each to the other
   and are bound by the same standards of good conduct and
   square dealing as are required between partners, an obligation
   which begins with the opening of the negotiations for the
   formation of the enterprise, applies to every phase of the
   business undertaken and continues until the enterprise has
   been completely wound up and terminated.

5. SAME—ABANDONMENT—DISSOLUTION—CONSENT.
   The relationship of joint adventurers may not be changed, de-
   parted from, abandoned or dissolved without the mutual con-
   sent of all parties concerned.

---

REFERENCES FOR POINTS IN HEADNOTES
[1–4] 30 Am Jur, Joint Adventures §§ 34, 35.
[5, 6] 30 Am Jur, Joint Adventures § 45.
[7, 8] 30 Am Jur, Joint Adventures § 31.
[9, 10] 30 Am Jur, Joint Adventures § 38.
[9, 10] Duty of joint adventurers *inter se* in respect of acquisi-
    tion or renewal of property rights or interests related to the
    enterprise. 62 ALR 13.
[11] 30 Am Jur, Joint Adventures § 59.

6. SAME—DISSOLUTION—EVIDENCE.

Finding of trial court in suit to require joint adventurer who managed the enterprise to account for profits made, that the joint adventure had not been dissolved as claimed by defendant *held,* sustained by record.

7. SAME—LIMITATION ON DEFENDANT'S LIABILITY—GUARANTEE OF RETURN OF INVESTMENT.

Claim that defendant's liability to plaintiffs as manager of joint venture was limited by his personal guarantee of the return of their investments *held,* untenable, where such guarantee related to subsequent venture and not the one upon which suit for accounting as to profits was based.

8. SAME—AUTHORITY OF MANAGER—IMPROVEMENTS.

The manager of a joint adventure who does not have express authority to bind the group for extensive improvements undertaken by the tenant would not have implied authority to make improvements which completely changed the character of the structure at a cost half again as great as the purchase price of the building itself, the implied authority of such a manager extending only to those matters of a routine and customary nature.

9. SAME—SECRET INTEREST OF ONE ADVENTURER.

One joint adventurer who secretly obtains an interest against the joint venture perpetrates a fraud upon his associates.

10. SAME—THIRD-PARTY BENEFICIARY CONTRACT INTEREST.

One joint adventurer who acquired a lessee's third-party beneficiary contract interest that was of value to the joint adventure does so on behalf of the joint adventure (CL 1948, §§ 691.541, 691.542).

11. SAME—MANAGER'S WIFE AS PARTY TO SUIT FOR ACCOUNTING.

Defendant wife of defendant manager of joint adventure was properly not dismissed as party defendant in suit by plaintiff-coadventurers for accounting as to profits, where assets of joint adventure were transferred to a new partnership, consisting of the defendants, although no written agreement was entered into between them and no certificate of copartnership was filed, and defendant wife's conduct indicated she was not a mere onlooker.

Appeal from Superior Court of Grand Rapids; Taylor (Thaddeus B.), J. Submitted January 13,

1956. (Docket Nos. 28, 29, Calendar Nos. 46,549, 46,550.) Decided June 4, 1956.

Bill by James Van Stee against Charles O. Ransford and Ann H. Ransford for accounting and payment of sums found due as his share of partnership assets. Similar action by Edward Bloom and Rose Bloom. Cases consolidated for trial and on appeal. Decree for plaintiffs. Defendants appeal. Affirmed.

*Harrington, Waer, Cary & Martin* and *Hilding & Baker,* for plaintiffs.

*McCobb, Heaney & Dunn,* for defendants.

SMITH, J. Here we have joint adventurers. One of them, it is asserted, has retained unto himself large profits. The aid of the chancellor is invoked, that he disgorge. It was so decreed. The consolidated case is before us on assignments of error, 21 in number. They reduce, in substance, to one proposition, that "the record does not support the findings and conclusions of the lower court in regard to any liability on the part of" the defendants.

We turn, hence, to the record. It is extensive, comprising over 400 pages of pleadings, testimony, and exhibits. It appears therefrom that the parties were coemployees. Defendant Charles O. Ransford was president and general manager of Herpolsheimer Company, a retail department store in Grand Rapids (hereinafter referred to as "Herpolsheimer"). Herpolsheimer was a subsidiary of Allied Stores Corporation, a company owning retail department stores throughout the United States, hereinafter referred to as "Allied." Plaintiffs Edward Bloom and James Van Stee were Ransford's subordinates in the company.

The premises on which the Herpolsheimer Company operated its main store were leased from the Herpolsheimer Realty Company, and the Michigan Trust Company, under leases expiring in August, 1949. In order to obtain additional space, Herpolsheimer leased a building owned by the estate of Otto Thum. This building, around which the controversy rages, will be described hereinafter as the Louis-Ottawa building. Herpolsheimer first took an assignment of an outstanding lease, then, as of August 7, 1944, entered into a new 5-year lease. The 5-year term of this lease brought it to expiration at approximately the same time as the expiration of Herpolsheimer's leases on its main store. Contained in the lease was a 90-day option to purchase the premises for the sum of $32,500. This the lessee failed to exercise.

Sometime in late 1944 or early 1945 defendant Ransford conceived the idea of purchasing the Louis-Ottawa building in order to protect Allied from its purchase by competitive interests. The project had Allied's blessing. Plaintiffs James Van Stee and Edward Bloom, likewise employees of Herpolsheimer, were approached and agreed to participate in the purchase. On September 24, 1945, Bloom advanced $2,000 by check to Ransford, to be used to bind the purchase of the Louis-Ottawa building. On the same date Ransford gave a $1,000 check to a realtor, together with an offer of purchase of the property. Defendant Ransford's offer of purchase for $35,000 was accepted by the Otto Thum estate, the sale subsequently approved by the probate court, and, on November 1, 1945, a deed was executed by the administrator of the estate to Ransford. Defendant then executed a purchase-money mortgage to a bank for $20,000 covering the property in question, he paying the difference between the mortgage money received and the purchase price of $35,000. Plaintiff

Bloom, on November 21, 1945, made an additional investment of $3,000, making a total contribution of $5,000, and plaintiff Van Stee contributed $5,000 at a later date. By January 31, 1946, defendant Ransford had received from plaintiffs, and other employee-investors not parties to this suit, a total of $18,000. On February 2, 1946, an agreement, which had been prepared by Ransford without legal counsel, was entered into by the respective parties. It provided:

"The property known as _____ Ottawa St., Grand Rapids, Michigan, and now operated by Herpolsheimer Co., as an appliance store, has been purchased in the name of C. O. Ransford for $35,000, subject to the terms of a lease between the Herpolsheimer Co. and Edna Elliot, administratrix of the Otto Thum estate. It is agreed to invest an additional $5,000 for the purpose of modernizing the property to change it from its present condition as represented by photograph 'A' to that represented by photograph 'B'.

"The $40,000 thus invested is to be considered as the basis of a partnership to be known as the 'Louis-Ottawa Realty Co.'

"Any additional investment is to be paid for out of the earnings so as to keep the capital account an even $40,000.

"A $20,000 mortgage loan payable by C. O. Ransford has been secured from the Peoples National Bank.

"The remaining $20,000 is to be paid in by the partners, each $1,000 representing a 1/40 interest in the partnership.

"That is, the $5,000 investment by Mr. and Mrs. Bloom represents a 12-1/2% interest; the $4,000 by Mr. and Mrs. Dickehut a 10% interest; the $5,000 by Mr. Van Stee a 12-1/2% interest; and the $6,000 by Mr. Ransford a 15% interest.

"Additional interest may be purchased by any of the partners or anyone else agreeing to subordinate

his interest to the interest of Allied Stores Corporation on the terms herein stated, by paying off portions of the principal of the mortgage loan plus interest at 4% from November 24, 1945.

"To the extent that such additional interests are left not purchased, the income of the property is to be applied to pay off the loan, and the value of the original investments will be proportionately increased. For example, if no additional interest is purchased, the original 10% interest will become a 20% interest upon the complete retirement of the $20,000 loan.

"It is mutually agreed that each of the partners is an employee of Allied Stores Corporation and that the property is held subject to the disposition of Allied Stores Corporation management.

"It is further mutually agreed and understood by and between the partners that the property, to-wit: —— Ottawa St., Grand Rapids, Mich., may be purchased at cost by Allied Stores Corporation, if it desires or leased by it, at an amount to yield no less than 5% per annum net on investment; or leased to the Herpolsheimer Realty Co. to be sublet to Allied Stores Corporation, or sold to the Herpolsheimer Realty Co. at a figure satisfactory to all, or disposed of in any other manner suitable to Allied Stores Corporation so long as it causes no loss to the partners.

"It is understood and agreed that the title to the property shall remain in the name of C. O. Ransford until pending leasehold negotiations between Allied Stores Corporation and Herpolsheimer Realty Co. and Michigan Trust Co. as trustee for the estate of Wm. G. Herpolsheimer are consummated, and that upon conclusion of such negotiations, if the property is not to be sold, title will be transferred to the partnership upon terms and conditions mutually agreeable with Allied Stores Corporation and the partners.

"The property shall be managed by C. O. Ransford in the name of Louis-Ottawa Realty Company.

All funds shall be deposited in the name of the partnership in Peoples National Bank of Grand Rapids, Michigan.

"A certified accountant's report of operation is to be rendered annually to each partner.

"Signed this 2d day of February, 1946.

"Witness:

| W. E. Pressler | C. O. Ransford | | |
| C. B. Anderson | James Van Stee | | |
| C. B. Anderson | Edward Bloom | Rose Bloom | |
| C. B. Anderson | B. L. Dickehut | Mrs. Maudie Dickehut | |
| C. B. Anderson | Donna Glerum." | | |

The mortgage loan referred to in the third paragraph of the above agreement was discharged in July, 1947, and a new mortgage entered into, in order to pay out the Dickehut interests. In December of 1948, this latter mortgage was discharged and a mortgage of $35,000 placed on the property. Plaintiffs assert that both of the latter mortgages were made without their knowledge or consent.

At the time of the Herpolsheimer entry upon the Louis-Ottawa lease, the building was, in defendants' words, "in no manner equipped to serve as a modern retail sales store." An extensive and expensive program of renovation was necessary and was accomplished. The records of Herpolsheimer show that by January 31, 1947, an expenditure of $63,215.47 had been made which sum was ultimately increased to $80,235.29. These improvements, which need not be here described, converted "an old building which had been used to house heavy machinery into a modern retail merchandizing store." It is not argued that the money was ill-spent, since, "by making those improvements Herpolsheimer did get a good volume of sales from the premises. Sales on the premises from August, 1946 until July of 1947 were

over a million dollars." The witness is defendant
Ransford.

After these improvements had been made, how-
ever, the lessors of the Herpolsheimer main building,
in April of 1947, leased that property to a competi-
tor. Changes in plans of Allied and Herpolsheimer
were necessary and the case before us arises out of
the dislocations occasioned thereby and defendant
Ransford's dealings with the Louis-Ottawa property.
"In that connection," stated the trial court, "it is
noted that one of the last paragraphs of the asso-
ciates agreement, as above set forth, required Mr.
Ransford to transfer title to the several parties to
the agreement upon conclusion of the negotiations
between Allied Stores, Inc., and Herpolsheimer
Realty Company. This was never done and Mr.
Ransford continued title in his name."

We will leave the affairs of the Louis-Ottawa
building, and its joint-adventurers, at this point to
examine those of the Michigan Distributors, Inc.
The affairs of this corporation become important to
us in this way (employing appellants' words):

"In 1948 Ransford became interested in a new
organization, Michigan Distributors, Inc. This
organization was in need of additional funds for ex-
pansion. Ransford made a proposal to the existing
partners in the Louis-Ottawa Realty Company by
written offer dated January 31, 1949. The offer con-
templated an exchange of the Louis-Ottawa Realty
Company interests for shares of stock in Michigan
Distributors, Inc., and the transfer of the Louis-
Ottawa Building to Michigan Distributors, Inc."

The proposal submitted was as follows:

"On behalf of Allied Stores Corporation I am now
concluding arrangements for the sale of our new
store and our warehouse properties to The Equitable
Life Assurance Society of the U. S.

"As these various property deals are now lined up, Allied has instructed me to exercise the option contained in our Louis-Ottawa Realty Company agreement to have all parties sell out their shares. Under the arrangement I would wind up with $80,000 of my own funds in the appliance store and full title to the property and all improvements would wind up in my name.

"However, I need a part of these funds to reinvest in the rapidly growing Michigan Distributors, Inc. Nevertheless, I cannot afford to sell out to raise cash because of a $15,000 tax which I would have to pay on such a sale.

"To obtain the cash necessary to continue to expand Michigan Distributors, Inc., I am willing to share my tax saving with shareholders of Louis-Ottawa Realty Company on the following basis:

"To avoid ruinous profits taxes the Herpolsheimer appliance store would be deeded to Michigan Distributors, Inc., at $35,000 instead of $85,000 and thereby save the $15,000 tax. Allied will enter into a good 3-year lease beginning August 1, 1949.

"For each $5,000 share of Louis-Ottawa Realty I would exchange $5,500 stock in Michigan Distributors. The $500 would be a tax-free profit, as I would tax it as my personal loss.

"If an additional $5,000 is invested by a Louis-Ottawa shareholder, he will receive $6,000 in Michigan Distributor stock for it with no tax, making an untaxed profit on a $10,000 investment of $1,500.

"This latter transaction would leave a Louis-Ottawa shareholder still owning approximately 1/10 of the appliance store and its income plus 1/10 of a going business with valuable distributor franchises."

There followed a discussion of the distributor franchises referred to, the proposal concluding with the following paragraph:

"To avoid uneasiness on the part of other retailers, the stock of Herpolsheimer employees or officials

would be issued to a nominee who would immediately indorse the stock over to its owner but continue to stand as the owner of record."

Subsequent thereto plaintiffs gave Ransford further moneys, either to be invested or to be considered as a loan, the testimony being in dispute with respect thereto. Bloom's contribution was $9,000 and Van Stee's was $5,000. No stock, as contemplated under the proposed agreement, was transferred, either to plaintiffs or nominees therefor.

The next step, in the words of the plaintiffs, was this:

"He (Ransford) sells the building which cost only $35,000 for $85,000, repays the partners' original investment and keeps the profit of $50,000."

In more detail, on February 3, 1950, defendant Ransford sold the Louis-Ottawa building to Bixby Office Supply Company for $85,000. Plaintiffs had no knowledge of this sale until they read about it in the local press. Ransford subsequently returned to plaintiffs their original investments in the Louis-Ottawa Realty Company, and their investment in Michigan Distributors, Inc. This did not satisfy them. They asserted that a profit of $50,000 had been made on the sale "for the benefit of Louis-Ottawa Realty Company partnership," and they demanded the payment of such sums as an accounting should show to "be rightfully due them as their share of the Louis-Ottawa Realty Co. partnership assets." The chancellor, as above indicated, decreed recovery.

What we have in all of the above is the charge, variously put, that one of the parties participated in the described venture enriched himself at the expense of his fellows. The name given the enterprise, whether that of partnership or joint adventure, is, with respect to the duty of the trust reposed, unim-

portant. The fiduciary duties are parallel. With respect to defendant Ransford they were particularly demanding. He was more than a mere joint participant for he was, as well, the manager of the enterprise. In the words of Mr. Justice Cardozo, in his classic opinion in *Meinhard* v. *Salmon,* 249 NY 458, 462 (164 NE 545, 62 ALR 1), referring to one Salmon, likewise the manager of a joint enterprise, "The 2 were coadventurers, subject to fiduciary duties akin to those of partners. As to this we are all agreed. The heavier weight of duty rested, however, upon Salmon. He was a coadventurer with Meinhard, but he was manager as well."

Not only, however, was Ransford under the "heavier weight of duty as manager," but, in addition, he was under peculiar obligations because he was the president and general manager of the company for which James Van Stee and Edward Bloom worked. They were not completely free, as to him, to inquire, to demand, or to take to task. He was the boss. So it is that plaintiff Van Stee, in speaking of his delay in asking the return of $5,000, says that "it was an embarrassing thing to bring up for a subordinate to the head of the company." Under such circumstances the obligation of the trustee is the more acute. It is compelling evidence of the complete trust and confidence reposed in him, that his associates permitted to stand in his name, and his alone, the legal title to their only asset. It was within his power to sell, encumber, or mortgage, subject only to those considerations of conscience so jealously guarded by a court of equity. We do not condemn the plenitude of power vested in the trustee by his coadventurers and subordinates. We insist only that his performance match in scruple and sensitivity the confidence reposed in him. As was said by Justice Cardozo in *Meinhard* v. *Salmon, supra* (pp 463, 464, 466):

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions (*Wendt* v. *Fischer*, 243 NY 439, 444 [154 NE 303]). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. * * *

"The very fact that Salmon was in control with exclusive powers of direction charged him the more obviously with the duty of disclosure, since only through disclosure could opportunity be equalized. * * * He might steal a march on his comrade under cover of the darkness, and then hold the captured ground. Loyalty and comradeship are not so easily abjured."

We are likewise committed. In *Lane* v. *Wood*, 259 Mich 266, 269, we stated, with reference to joint adventurers, that:

" 'Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated.' "

In *McIver* v. *Norman*, 187 Or 516, 522, 523 (205 P2d 137, 213 P2d 144, 13 ALR2d 749), the Oregon

court discussed the principles of law applicable to joint adventurers, stating that:

" 'The modern decisions indicate that the courts regard the right of joint adventurers, in matters between themselves, as governed by the principles constituting and controlling the law of partnership: 15 RCL, p 500, § 1. We quote from page 501, § 3, of that volume:

" ' "The relation between joint adventurers is fiduciary in its character, and the utmost good faith is required of the trustee to whom the deal or property may be intrusted, and such trustee will be held strictly to account to his coadventurers and he will not be permitted, by reason of the possession of the property or profits, whichever the case may be, to enjoy an unfair advantage, or have any greater rights in the property, by reason of the fact that he is in possession of the property or profits as trustee, than his coadventurers are entitled to. The mere fact that he is intrusted with the rights of his coadventurers imposes on him the duty of guarding their rights equally with his own, and he is required to account strictly to his coadventurers, and if he is recreant to his trust, any rights they may be denied are recoverable." ' *Thimsen* v. *Reigard,* 95 Or 45, 54 (186 P 559)."

At the very outset of the case we are pressed with the argument, vigorously denied, with extracts of the record cited pro and con, that the joint venture in the Louis-Ottawa Realty Company was dissolved (prior to the sale of the Louis-Ottawa building) by plaintiffs' alleged agreement to accept stock in Michigan Distributors, Inc., in lieu of their interests in such joint venture. With respect to this contention the trial court found that:

"This would involve a change in the obligations and relationship of the parties. There is no testimony upon which the court could find that a mutual agreement was entered into to abandon or dissolve

the relationship created by the agreement of February 1946, or could there be any such termination without the mutual consent of all parties concerned. Therefore, the attempt of the defendant in 1949 to dissolve the agreement and his act of placing his wife in the place of the other associates was a nullity and his associates by that act lost nothing of their respective interests. In a case involving a joint venture, the court said in *Polk* v. *Chandler,* 276 Mich 527, on page 535:

" 'Defendant McAlpine appeals from the decree holding him liable, notwithstanding the claimed release.

" 'The relations and obligations fixed by the agreement of July 18th could not be changed or departed from, except by unanimous consent. Consent by members, less than all, attending a meeting, that Dr. McAlpine and Mr. Chandler be released upon assigning their interests to the trustee was inoperative and subsequent assignments by such persons were noneffective to release them from participation in the joint adventure.' "

Our examination of the record leaves us with a like conclusion. The court was correct in finding that plaintiffs, although investing money in Michigan Distributors, Inc., did not agree to terminate the joint adventure. In view of the finding that no such agreement was ever consummated, it is pointless to discuss the questions raised respecting the applicability of the "blue sky law" to the proposed transfer of stock in Michigan Distributors, Inc. Plaintiffs' claim, and the accounting rendered herein, is predicated solely on the joint adventure in Louis-Ottawa Realty Company.

Defendants Ransford further claim that plaintiffs' demand for a return of their investment made under the personal guarantee of defendant Charles O. Ransford determines the extent of defendants' liability. The testimony bears out the fact that defend-

ant did guarantee plaintiffs their investment in the Michigan Distributors, Inc. That each of their investments was returned is not disputed. It is our conclusion, however, that the guarantee related only to Michigan Distributors, Inc. Such guarantee is not controlling of defendants' liability in the joint adventure of the Louis-Ottawa Realty Company. What we are concerned with here is an accounting of the profits derived from the sale of the Louis-Ottawa Realty property. Defendants' contention in this regard cannot be sustained.

Thus we approach the nub of the case with respect to the asserted profits. The argument advanced by defendants turns on the matter of the improvements made to the Louis-Ottawa building. It is the position of the defendants that the improvements made were within Ransford's scope of authority as manager, and that his payment for same was chargeable to the joint venture. "Thus," assert appellants, "at the conclusion of the Allied Stores Corporation's relinquishment of its rights in the Louis-Ottawa property, the venture owned the improved building worth some $85,000 and Ransford had approximately $53,000 of his own funds invested in the venture."

The difficulties with the foregoing argument were clearly perceived by the trial court. That there was no express authority in any of the coadventurers to bind the group for the extensive improvements undertaken by the tenant, the better to fit the leased property for the conduct of its business by the tenant, is clear. The lease, in fact, required the lessee "to assume and pay for all repairs and upkeep thereof." It is of interest to note, with respect to the improvements made, that it was the position of Allied's chairman of the board, B. Earl Puckett, that "the expenditures made on the building by either Allied or Herpolsheimer were not

required by the lease. They were made voluntarily. In the course of the alterations they became a part of the realty and were owned by whoever owned the property." As to the authority implied by virtue of Ransford's managerial position, it extends only to those matters of a routine and customary nature and does not include improvements so extensive as to completely change the character of a building (here from that of an old building, housing heavy machinery, to that of a modern retail store) at a cost half again as great as the purchase price of the building itself.

Nor is the position of the defendants advanced by the argument that "in return for his (Ransford's) payment of this amount, Allied Stores Corporation or the Herpolsheimer Company would waive its right as a third-party beneficiary to the Louis-Ottawa agreement leaving all of the improvements in the property still held in Ransford's name as the manager of the venture." If the acquisition of these disputable rights was of any value to the joint venture, or the coadventurers therein, they were rights to be shared by all, upon full disclosure of their existence, their salability, and their possible value, not to be secured in silence by one. The record, on this phase of the case, amply sustains the findings of the trial court, with which we are constrained to agree, that:

"The defendant had no authority to bind the plaintiffs and by attempting to assume such liability he gained no greater interest in the association than his original investment represented and at the time of setting up the opening accounts of the venture this appeared to be a 1/20th interest or an investment of $2,000. He could not secretly obtain an interest against the joint venture and the attempt to do so was a fraud upon his associates. The defendant cannot justify his claimed assumption of the Herpol-

sheimer Company's expenses for alterations on the basis of a third party beneficiary interest of Allied Stores, Inc. In this respect the statute provides (CL 1948, §§ 691.541, 691.542 [Stat Ann §§ 26.1231, 26.1232]) as follows:

"'Sec. 1. Any person for whose benefit a promise is made by way of contract, as hereinafter defined, shall have the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.

"'Sec. 2. A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise has undertaken to give or to do or to refrain from doing something directly to or for said person.'

"It is sufficient to say that at no point or place in the agreement does it appear to be contemplated of a sale to any one of the investors. Mr. Ransford in his capacity as trustee could no more buy this in his fiduciary relationship than an estate executor can buy from the estate. Defendant has cited the case of *Ireland* v. *Lester*, 298 Mich 154. An examination of this report does not in any respect sustain defendant's contention."

Subsequent to January, 1949, the date of Ransford's abortive attempt to terminate the joint venture in Louis-Ottawa by alleged transfer of plaintiffs' interests to Michigan Distributors, Inc., Ransford directed his accountants to name his wife, defendant Ann H. Ransford, as his partner on the income tax return for the year February 1, 1949 to January 30, 1950. The accountant, McEwan, testified as follows:

"*Q.* Will you refer to the report that you have in front of you on page 2 and the last sentence at the top of the page you state, 'As of February 1, 1949, a new partnership was formed, consisting of Mr. and Mrs. Charles O. Ransford as partners, and which was still in existence as of July 31, 1950.' Will

you tell us from what source you got that information?

"*A.* From Mr. Ransford."

Defendants' exhibit 31 describes the transaction in these terms:

"The partnership interests for the period covered by this report were held jointly by Charles O. and Ann H. Ransford, they having acquired as of February 1, 1949 the partnership interests in a company of the same name owned by Mr. and Mrs. Charles O. Ransford, Mr. and Mrs. Edward Bloom, Mrs. Donna Glerum and Mr. James Van Stee."

It is urged upon us that the trial court erred in not granting the motions of defendant Ann H. Ransford to dismiss the case as to her. It is argued that no written partnership agreement was ever entered into between defendants Ransford, that no certificate of copartnership was filed. We are, in addition, cited to the case of *Western Shoe Company* v. *Neumeister*, 258 Mich 662, in which we held a widow not liable as a partner in the business after the death of her husband. We pointed out (p 667) that the statements as to her partnership status "were made without her knowledge or consent," and appellants urged that here there is equal lack of knowledge. We must observe, however, as we pointed out in the same case, that "in the absence of an express agreement, her acts and conduct in relation to the business are the test to be used in determining if a partnership existed." We note, with regard to defendant Ann Ransford's acts and conduct, that she was not a mere passive onlooker with respect to the matters before us (though we express no opinion as to the legal effect of mere inaction upon an asserted partnership status). Thus the narrative testimony of defendant Charles Ransford discloses that:

"In April of 1950 I settled the Bixby $16,500 note and the guarantees that went with it for $10,000. The check on that transaction was paid to C. O. and Ann H. Ransford and was in settlement of a contract of February 3, 1950, defendants' exhibit 43, which was also made to Charles O. and Ann Ransford. I deposited the check in the Old Kent Bank on April 8th to the account of C. O. Ransford doing business as Dealers Discount Company. I testified previously I got the indorsement on the check by my wife. I didn't cash the check, I just had her indorse it and I put it in my individual account doing business as Dealers Discount Company."

Exhibit 43, above referred to, as abstracted, is as follows:

"Rental agreement dated February 3, 1950 between Charles O. Ransford and Ann H. Ransford, husband and wife, and Bixby Office Supply Company covering Lot 8, Block 6, Campau Plat, relating to the percentage lease on the property held by Herpolsheimer Company for a 3-year period commencing August 7, 1949. The agreement provides:

"1. That Bixby's shall give to the Ransfords promissory note in the amount of $16,500 to be applied on the purchase price of the premises.

"2. If the percentage lease to Herpolsheimer Company does not produce $500 per month for the lease year ending August 7, 1950, $6,000 per year for any lease-year subsequent to the year ending August 7, 1950, or $4,500 for the period August 7, 1953 to May 7, 1954, any deficiency shall be credited on the note and any excess shall be paid to the Ransfords."

Upon the record as a whole and the various instruments and exhibits referred to, we are not convinced that the trial court's rejection of the motion to dismiss defendant Ann Ransford was error.

Other claims of error made by defendants have been carefully considered. We find none that presents any reason why the decree of the trial court

should be reversed. The testimony and the evidence, including elements of the accounting, were conflicting and the record is voluminous. While we have examined the case *de novo* we are ever mindful of the trial court's presence in the courtroom and our absence, his observation of candor or the lack thereof, and our difficulties in so construing the printed record. We find no error of law in the case. We are in accord with the findings of the trial court and we affirm the decree.

Costs to appellees.

DETHMERS, C. J., and SHARPE, KELLY, CARR, and BLACK, JJ., concurred with SMITH, J.

BOYLES, J., concurred in the result.

The late Justice REID took no part in the decision of this case.