Robert GARROW and Mary Garrow, Plaintiffs,

v.

SOO LINE RAILROAD COMPANY, Defendant and Third-Party Plaintiff,

v.

AMRON CORPORATION, Third-Party Defendant.

Civ. A. No. 70-C-122.

United States District Court, E. D. Wisconsin.

Aug. 16, 1973.

Phillip E. Crump and Robert E. Gratz, Milwaukee, Wis., for plaintiffs.

Reginald W. Nelson, Milwaukee, Wis., for defendant and third-party plaintiff.

David E. Beckwith and John R. Dawson, Milwaukee, Wis., for third-party defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

Plaintiff Robert Garrow was injured when the railroad freight car he was loading began to move and the closing door of the freight car struck him. He brings this action against the railroad claiming that its negligence, for example, in failing to secure the door, caused the accident. The railroad has impleaded plaintiff's employer, Amron Corporation (hereafter "Amron") from whom it

seeks contribution or indemnity under a contract in existence at the time of the accident. The matter is before me on Amron's motion for summary judgment dismissing the third-party action. The motion is denied.[1]

Amron is a wholly-owned subsidiary of Norma-Hoffmann Bearings Corporation which is, in turn, a division of Gulf and Western Industries. Its principal business has always been manufacturing shell and projectile casings and other ammunition components for the government.

In February 1957, Amron made plans to erect a new plant in Waukesha, Wisconsin. To finance the acquisition of the land and the construction of the plant, the board of directors of Amron formed a new corporation, Waukesha Realty Corporation (hereafter "Waukesha Realty"). Waukesha Realty was strictly a financing corporation with no employees, furniture, fixtures, or equipment. Most of its stock was held by Amron, though a significant amount of its stock was issued to individual residents of Waukesha and Milwaukee. It also borrowed funds from individual residents of Waukesha. Once Waukesha Realty obtained a mortgage and acquired the property needed for the plant, it leased the property back to Norma-Hoffmann Bearings Corporation, knowing that it would in turn sublease the property to Amron. The understanding was that Amron would be "charged" the minimum rent necessary to cover Waukesha Realty's indebtedness under the mortgage.

Shortly thereafter Amron began negotiating with the defendant railroad to have a spur track constructed on the property. Throughout the period of negotiations, it was understood that the anticipated contract, which is the basis for the third-party action, would bind Amron and the railroad, and it was those two parties who participated in all negotiations. But for reasons yet unexplained, Waukesha Realty rather than Amron itself entered the formal written contract.

Under the spur track contract the contracting industry grants the railroad an easement to install the spur track and agrees to pay taxes and part of the costs of construction, to rent rails and other track materials, to maintain certain safety standards, and to assume all responsibility for damage from fire. The contracting party also agrees to the following indemnification provision which prompts the railroad's third-party action here:

"10. The Industry also agrees to indemnify and hold harmless the Railroad Company and its agents for loss, damage, injury or death from any act or omission of the Industry, or its employes or agents, . . . to the person or property of any other person or corporation, while on or about the spur track; and if any claim or liability other than from fire shall arise from the joint or concurring negligence of both parties hereto, it shall be borne by them equally."

For its part the railroad agrees to install and maintain the spur track and to reimburse the contracting industry for certain costs incurred when the track is used to serve other industries.

## I.

The nature of the railroad's third-party action against Amron is complex. Naturally the action arises from the indemnification provision in

1. Perhaps the ideal administrative approach to this case would be to decide all aspects of the third-party action prior to trial. The unexplained facts in the case and the railroad's failure to move for summary judgment in its favor make that approach inappropriate, however. To avoid reintroduction at trial of the lengthy materials already submitted, to minimize the duplication of effort, and to provide some framework for the resolution of the third-party action, this opinion resolves the issues which have been fully presented and sets forth my understanding of the remaining issues. How the remaining issues should be presented and what role, if any, the jury has in resolving them are questions to be decided.

the spur track contract. But the railroad does not ask for interpretation of the contract or for the application of any other principles related to the law of contracts.[2] Instead the railroad asks for equitable relief under common law principles dealing with the treatment of corporate identities. Specifically, the railroad asks that the corporate existence of Waukesha Realty be disregarded and that Amron and Waukesha Realty be treated as one and the same under the spur track contract. Hence, since the contract provided that Waukesha Realty would indemnify the railroad for its negligence, the railroad claims that Amron should now indemnify it for Amron's negligence.[3]

The railroad requests a novel application of equity principles. In the past the corporate form has been disregarded under rare circumstances. In virtually all those cases, however, a party was either trying to hold individual officers and stockholders for the liabilities of their corporation, or a party was trying to hold one corporation, usually the parent, for *the liabilities of another corporation,* usually the subsidiary. Such would be the case here if the railroad were trying to hold Amron for the liabilities of Waukesha Realty. But the railroad asks for more. Since no one claims that Waukesha Realty was negligent, it has no liabilities under the contract. Consequently, the railroad asks that Amron and Waukesha Realty be treated as identical so that, pursuant to the contract, it will be indemnified for

Amron's negligence and not just for the negligence of Waukesha Realty. Such relief exceeds that given in any of the cases which the railroad cites or which has otherwise come to my attention.

That the relief sought is novel does not mean it must not or should not be granted. In those cases where the corporate form was disregarded, it was commonly expressed that courts should fashion whatever relief is necessary to prevent injustice. See, e. g., Nichols & Co. v. Secretary of Agriculture, 131 F.2d 651, 655 (1st Cir. 1942); United States v. Milwaukee Refrigerator Transit Co., 142 F. 247 (7th Cir. 1905); Duel v. National Surety Corporation, 64 F.Supp. 961 (E.D.Wis.1945), aff'd 157 F.2d 516 (7th Cir. 1946); Marlin Electric Co. v. Industrial Commission, 33 Wis.2d 651, 148 N.W.2d 74 (1967); Stebane Nash Co. v. Campbellsport Mutual Ins. Co., 27 Wis.2d 112, 133 N.W.2d 737 (1965); 18 Am.Jur.2d Corporations § 15 (1965); 18 C.J.S. Corporations § 7 (1939).

The railroad argues with great force that injustice can only be avoided by granting the relief sought. The spur tract contract is unconscionable and absurd, the railroad claims, if Amron, the company which would actually ship and receive the railroad cargo, is not considered the contracting party. The contract's preamble, for instance, states that the spur track was being constructed "to serve the Industry," i. e., the contracting industry, and that the railroad was agreeing to operate over the spur track "in serving the industry." [4] Yet

---

2. Hence, this case does not involve the corpus of law dealing with the rights and liabilities arising from contracts, even though such matters as the intentions of the parties and the soundness of certain interpretations of the contract will be considered to the extent they bear on the equitable questions raised.

3. The policy in Wisconsin is to interpret indemnification provisions to protect employers from any liability beyond that imposed by the Workmen's Compensation Act. In this case, however, the provision was unambiguous and hence enforceable despite this policy. Algrem

v. Nowlan, 37 Wis.2d 70, 154 N.W.2d 217 (1967). Consequently, the only question is whether for equitable reasons the provision should apply to the employer. As noted above, the question is not one of contract interpretation.

4. Although installing and maintaining the spur track could conceivably serve the interests of Waukesha Realty, the nominal landlord, by increasing the value of the property, the use of the phrase "serving the Industry" in paragraphs 9, 11, and 12 indicate that it did not merely refer to this indirect service to the landlord.

there is no serious question but that the contract was designed to serve Amron. Similarly, the clause in which the "Industry" assumed responsibility for certain damages caused by those locomotives operated "for the purpose of serving the Industry" would be meaningless if Waukesha Realty alone, a mere paper corporation, was the "Industry."

Other provisions of the contract suggest even more strongly that the railroad believed it was contracting with the party who would actually be operating the plant. Paragraph 11, for example, sets forth the conditions under which the railroad would have the right to use an extension of the spur track to serve other industries. One of the conditions is that such use of the spur track will not unreasonably interfere with service to the Industry. Of course, this provision would be meaningless if the only Industry was Waukesha Realty. But beyond that, the provision suggests that the rest of the contract would be meaningless if Amron was considered one of these "other industries" rather than the contracting industry itself. Finally, the very indemnification provision at issue here loses significance if Waukesha Realty is recognized as the only contracting industry, for Waukesha Realty by its very nature would not commit the negligent acts or omissions envisioned by that provision.[5]

The parties' course of performance under the contract also manifests their actual intent. Although Waukesha Realty made the initial deposit for the spur track, Amron made all other rental and maintenance payments which the contract required of Waukesha Realty, and, of course, it was Amron who handled all negotiations.

Why at the close of negotiations Waukesha Realty was substituted for Amron as the contracting party is not clear. An earlier draft of the contract in which the named parties were Amron and the railroad had been prepared but not signed. If the railroad, knowing the facts, deliberately chose to make Waukesha Realty the contracting party, even though much of the contract would then be absurd. Amron should prevail.[6] But in the absence of such a showing, the contract itself and the surrounding circumstances suggest that the railroad reasonably believed the company actually operating the plan would be bound by the contract, and believed specifically that such company would be bound to indemnify it for liabilities caused by that company's negligence. Although an action in fraud is not alleged, the railroad does claim that it was deceived and that Amron, if only by silence, promoted that deception. Since Amron alone has moved for summary judgment, and the railroad requests the opportunity to present further evidence on these questions, all inferences must be drawn in the railroad's favor. I am satisfied that if under past law the corporate form of Waukesha Realty may be disregarded, the novel relief the railroad seeks is warranted.

## II.

Even assuming that the facts of this case warrant the novel relief sought, the threshold question remains whether under past law this is an appropriate case for disregarding the corporate form of

---

5. The care with which Amron negotiated the contract, as reflected by Exhibit I of the Lambert affidavit and Exhibits E and F of the Nelson affidavit, answers Amron's contention that since the contract was a standardized form contract, the absurdity of its provisions should be taken lightly.

6. Amron contends that such deliberation and knowledge should be imputed to the railroad on the basis of a letter dated March 8, 1957, in which a representative of the railroad asked that the papers granting an easement to the railroad be executed by Waukesha Realty. But as the railroad points out, paragraph 3 of the spur track contract requires such authorization by the owner of the land even if it is not the contracting party.

Waukesha Realty. The railroad relies upon what is known as the "instrumentality theory" which provides that the corporate form of a company may be disregarded when that company functions merely as the "instrumentality" of another. As Justice Cardozo observed, the law is "enveloped in the mists of metaphor" since courts merely cumulate the facts in each case and then decide whether or not to label a particular corporation as the "instrumentality" of another. Berkey v. Third Ave. Ry. Co., 244 N.Y. 84, 155 N.E. 58 (1926).

Nevertheless, certain prerequisites for disregarding the corporate form have emerged. See Lowendahl v. Baltimore & Ohio R. R. Co., 247 App.Div. 144, 287 N.Y.S. 62 (1936); "Liability of Corporation for Contracts of Subsidiary," 38 A.L.R.3d 1102 (1971). The parties agree that control of one corporation by another is a necessary element and that the control must be a proximate cause of the alleged injustice at issue. Moreover, the control must not be merely theoretical. For instance, majority ownership alone is not enough, nor is it enough that the directors and officers of the principal are also directors and officers of the alleged "instrumentality." Rather, the theoretical control must be so exercised that the prime function of one corporation is but to serve the other.

Amron held virtually complete control over Waukesha Realty. All the officers of Waukesha Realty were officers of Amron. Of the six directors of Waukesha Realty, five were officers or directors of Amron. The purchase of Class A stock by individual residents in the surrounding area created only an appearance of outside control. Waukesha Realty itself was to repurchase all the Class A stock at fixed prices which provided a 6 per cent return for the shareholders. The amount of Class A stock repurchased and the method of doing so was to be determined entirely by the Class B Directors who were, of course, selected solely by Amron. The Class B directors also held exclusive authority to select the officers of Waukesha Realty. Amron insured continued control of Waukesha Realty by prohibiting the outside stockholders from transferring any shares without the consent of Amron or without first offering the shares to Amron or Waukesha Realty.

The restrictions imposed on Waukesha Realty's opportunity for success further indicate that it functioned only as an instrument for Amron's benefit and not as an enterprising corporation in its own right. Contrary to the implication in Amron's brief, Waukesha Realty would not gain when the premises appreciated in value because of improvements like the spur track, for Amron held the right to purchase the premises at a price equal to the depreciated book value of the premises as shown on the books of Waukesha Realty. Nor would Waukesha Realty profit from renting the premises, for the leasing agreements were arranged to charge Amron the minimum rent necesssary to serve the interest on Waukesha Realty's indebtedness and to retire the principal on this indebtedness over the term of the lease.

As Amron candidly admits, the prime function of Waukesha Realty was to acquire the land and construct the plant which Amron wished to use and then to lease those premises back to Amron for Amron's benefit. Upon the facts presented I am satisfied that Amron exercised the requisite degree of control over the policies and business practices of Waukesha Realty during the period in which the spur track contract was made. In the absence of any indication to the contrary, I must presume that Amron's control over Waukesha Realty was a proximate cause of the substitution of Waukesha Realty as the contracting party.[7] Since it was that unexplained substitution of parties which now threatens to deny the railroad its reasonable expectations under the contract,

---

7. This presumption may be rebutted should Amron show the actual reason for the substitution of Waukesha Realty as the contracting party.

Amron's control over Waukesha Realty appears sufficiently related to the particular unjust result from which the railroad seeks relief to justify holding Amron responsible.

Amron contends, however, that the corporate form of Waukesha Realty must be recognized because the evidence fails to indicate that Amron used its control of Waukesha Realty to commit fraud. The railroad denies that fraud must be shown, claiming that it is sufficient if injustice will result unless Amron is held responsible. In claiming that fraud must be shown, Amron relies primarily upon dicta in the Seventh Circuit case of Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157, 160 (7th Cir. 1963), where the court adopted the test set forth in Lowendahl v. Baltimore & Ohio R. R. Co., 247 App.Div. 144, 287 N.Y.S. 62, aff'd 272 N.Y. 360, 6 N.E.2d 56 (1936). One element of that test is "fraud or wrong by the parent through its subsidiary, e. g., torts, violation of a statute or stripping the subsidiary of its assets." *Steven*, 324 F.2d at 160. In *Lowendahl* similar dicta was used:

> "'(2) Such control must have been used by the defendant [principal] to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; * * *'" 287 N. Y.S. at 76.

The railroad replies that a fair reading of even these most demanding statements indicates that many other "wrongs" and "unjust acts" besides fraud will warrant relief. This is especially true when, as here, the corporate form of an "instrumentality" is used to escape liabilities which would ordinarily be imposed upon the principal. Forest Hill Corporation v. Latter & Blum, Inc., 249 Ala. 23, 29 So.2d 290 (1947); Shea v. Leonis, 14 Cal.2d 666, 96 P.2d 332 (1939); McIver v. Norman, 187 Or. 516, 205 P.2d 137, rehearing denied 187 Or. 527, 213 P.2d 144 (1949). The absurdity of the contract when Waukesha Realty is the contracting party combined with Amron's failure to explain the substitution of parties suggest that Amron at least neglected to inform the railroad of the status of Waukesha Realty and of the effect of making it the contracting party.[8] Under the circumstances of this case, I believe even such passive deception should trigger the equitable intervention of the court.

### III.

Amron moves in the alternative for a determination that the indemnification provision applies only to common law negligence and not to a violation of Wisconsin's safe place statute. In a similar contract the Wisconsin Supreme Court recently held to the contrary:

> "Finally, respondent contends that the indemnity agreement refers only to common law negligence, rather than the higher standard of care required by Wisconsin's safe-place statute. We do not agree. The safe-place statute does not create a new cause of action [citation omitted] but merely establishes an increased standard of care, violation of which is negligence. [Citation omitted.] Violation of the safe-place statute would, therefore, be included under this indemnity agreement." Baker v. McDel Corporation, 53 Wis.2d 71, 79, 191 N.W.2d 846, 851 (1971).

But unlike the case here, the indemnification provision in *Baker* was not being used against the injured man's employer. Hence, the court did not consider the long standing policy of construing such contracts in favor of the employer. Young v. Anaconda American Brass Co., 43 Wis.2d 36, 168 N.W.2d 112 (1969); Grede Foundries, Inc. v. Price Erecting Co., 38 Wis.2d 502, 157 N.W.2d 559

---

8. Of course, the railroad has also failed to explain why Waukesha Realty was substituted as the contracting party. Yet if any reason for the substitution of parties existed, Amron would be the logical one to indicate it.

(1968). I do not believe, however, that the Wisconsin Supreme Court would create an exception to the clear rule of *Baker* to further this policy. That the concept of negligence includes those standards of care set by statute is simply too well established in Wisconsin to construe the word negligence, as Amron requests, especially since the contract was made in this state by parties doing business here to cover services to be performed here.

It is therefore ordered that the third-party defendant's motion for summary judgment dismissing the third-party action be and it hereby is denied.