### In re WASHINGTON MEDICAL CENTER, INC., Debtor.

#### Bankruptcy No. 79–00186.

United States Bankruptcy Court,
District of Columbia.

April 10, 1981.

George H. Clark and Judith T. Andersen, Washington, D. C., for plaintiff Washington Med. Center.

Jo V. Morgan, Jr., Charles J. Steele, Richard M. Tarby, Whiteford, Hart, Carmody & Wilson, Washington, D. C., for defendant Group Hospitalization, Inc.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

Washington Medical Center (hereinafter referred to as "WMC"), a debtor in a previously-confirmed Chapter XI case [1], has timely objected to the claim of Group Hospitalization, Inc. (hereinafter referred to as "GHI"), on the grounds that liability for the amount claimed is solely the liability of Doctor's Hospital, Inc. (hereinafter referred to as "DHI"), a wholly-owned subsidiary of WMC.[2] The liability at issue arises as a result of a contract entered into between GHI and DHI on February 1, 1972, whereby GHI agreed to compensate the Hospital for the medical services which it rendered to GHI subscribers. Pursuant to this contract, GHI would advance to DHI tentative weekly payments based on projected estimates, and at the end of the year the final liability would then be determined by GHI as a result of a cost audit. If the year end determination disclosed an amount due, that amount was required to be paid within 30 days by DHI; and if not paid within that specified time period, the amount due could be offset against the current amounts being

---

1. An order of confirmation was previously entered by this Court on December 3, 1980. The claim of GHI was filed on October 25, 1979, and objections were timely filed by WMC on February 19, 1980. This Court retains jurisdiction over this scheduled matter based on the provisions of the plan of confirmation.

 It should also be noted that the trial hearing conducted by the Court on February 4–5, 1981, was strictly limited to the issue of liability and any issue concerning the amount due under the underlying contract between the parties will be subject to a further trial hearing.

2. Doctor's Hospital filed a voluntary petition in bankruptcy under Chapter I–VII on September 18, 1979, the same date that WMC, its parent company, filed its petition under Chapter XI.

paid by GHI pursuant to the contract for current medical services. During the period of time from the inception of the contract through DHI's close of business in 1979, there was always, with the exception of two calendar years, a year end liability due GHI as a result of overpayments. It was a direct result of overpayments for the years 1977 through 1979 that the subject liability arose and for which the proof of claim was filed.[3]

GHI predicates its claim against WMC, the parent corporation of DHI, on the following grounds—an alter ego theory, the theory of express contract, implied and quasi contract and estoppel.[4] WMC denies liability under any of the aforementioned theories and asserts that the liability, if any, for overpayments made under the contract, is solely that of DHI. For the reasons set forth in this opinion, the Court finds and assesses liability against WMC based on a theory of equitable estoppel.

## FINDINGS OF FACT

WMC, a Virginia corporation, was the parent corporation of DHI and owned all of its outstanding stock. In addition to DHI, WMC, a real estate holding company, was also the parent of several other wholly-owned subsidiaries which provided DHI with such services as laundry, collection, pharmaceutical and other related business services. H. C. Deyerberg, a key figure in the history of this litigation, was first employed by WMC in 1972 as Executive Vice President and in June of 1972 as its President. He also served on the Board of Directors of both WMC and DHI. Sometime subsequent to 1976, H. C. Deyerberg became a Vice President of DHI.

DHI, a District of Columbia corporation, had its own separate Board of Directors and although a wholly-owned subsidiary, the evidence of record establishes that it functioned as a separate corporate entity during the critical period of time 1972 through 1979. Despite operating losses, as indicated by its own financial statements, there is no satisfactory evidence showing that DHI was originally undercapitalized. At all times during this time period there were separate books and records maintained by DHI, albeit through a central accounting department with the parent corporation. Based on the testimony of WMC's President, it was shown that the use of a central accounting department and the filing of combined tax returns is not an unusual procedure for large corporations. It is further significant to note that DHI filed a voluntary petition in bankruptcy on September 18, 1979, and that the duly-appointed trustee in bankruptcy, David Machanic, Esquire, has now fully administered that bankruptcy estate. The evidence of record pertaining to that bankruptcy case, of which the Court takes judicial notice, and with specific reference to the trustee's filed accounts and reports, support the separate identification and functions of the corporate entities involved. The accounts filed by the trustee in bankruptcy readily reflect that the liabilities and assets of DHI, as a separate corporation, are fully documented by the trustee with respect to all phases of administration of that estate.

The contract entered into with DHI to provide hospital services to GHI subscribers is dated February 2, 1972, and WMC was not a signatory to that contract. Despite the maintenance of two distinct corporate entities, the evidence of record clearly establishes that the key figures in dealing with GHI—with respect to the matter of overpayments and related cost report matters made to DHI—was H. C. Deyerberg. In view of the fact that the documentary evidence is not disputed in any material way, the factual issues, in the final analysis,

---

**3.** As a result of the application of a 1979 credit, WMC has asserted that the existing liability for 1977 was in effect cancelled. They postulated that the sole remaining liability relates to the calendar year 1978. However, the issue as to the amount due will not be decided at this hearing.

**4.** The essential elements of estoppel have been advanced and were argued at the time of trial, but were not specifically set forth in the post-trial brief filed by GHI on March 3, 1981.

are reduced to what inferences and conclusions should be drawn from the extensive correspondence and negotiations that transpired between GHI and WMC. Commencing in 1972 and continuing through the filing of the Chapter XI for WMC, the primary contacts made between the parties concerning the matter of overpayments due from DHI, was by the parent corporation, acting through its President, H. C. Deyerberg. In fact, in 1973, WMC executed a promissory note in the amount of $775,000, as well as an accompanying deed of trust securing GHI for excessive advances which had been made by GHI to DHI for a prior time period. The deed of trust was secured by real estate owned by WMC. Although this latter obligation, as evidenced by the note and deed of trust, was paid by WMC in 1976, WMC nonetheless continued to negotiate directly with GHI for subsequent overpayments[5] concerning the years 1977 through 1979 which are now at issue in this litigation.

Although the separate and related party doctrine which is specifically set forth in the contract entered into between the parties (Exhibit 6) pertains solely to the cost reporting as maintained by WMC, it is relevant to note the manner in which all major business transactions were carried out with GHI during this time frame. H. C. Deyerberg was the principal officer (President) in the hierarchy of WMC, and with respect to the issue of overpayments, WMC was clearly and actively engaged in the negotiations. This is further made apparent by the fact that although the detailed billing was calculated in the name of DHI, the actual invoices as well as the documented statements were sent to WMC. These invoices, although paid by DHI with their own checks, were routinely accepted by the parent WMC.

Typical of the business dealings between the parties is the manner in which the overpayments were handled. On March 24, 1976, H. C. Deyerberg directed to Benjamin Giuliani of GHI, on WMC stationery, a proposed repayment schedule for overpayments relating to the calendar years 1971 through 1973. Although the first paragraph of that letter refers to the debt "... due GHI from Doctor's Hospital", the third paragraph of that same letter leads one to reasonably conclude that WMC is committing itself to at least a portion of the debt by reason of the following language:

> "In response to Mr. Farver's question as to *our* willingness to apply a portion of any of the expected proceeds from the sale of the Metropolitan facility to the District of Columbia Government, we have made some preliminary estimates of the probability of cash proceeds flowing to this corporation and I believe that we can be reasonably certain and will therefore commit no less than $150,000 of those [sic] proceeds for application against the $389,000 presently indicated as due from Doctor's Hospital to GHI." [emphasis added] (Exhibit 14)

In the overall context of these negotiations, this cited language can only result in the impression that WMC is "committing" itself (as well as DHI, its subsidiary) to pay that obligation. It is clear from the reply of GHI to WMC (see Exhibit 15) that they relied upon these representations which emanated solely from the parent corporation. This reliance on the part of GHI, which is reflected throughout the long and continuing relationship between the parties, was certainly reasonable as demonstrated by a later letter (Exhibit 18) transmitted to WMC concerning the audit of a cost report.[6]

While none of the correspondence at issue sets forth specific contractual details, nor is there any indication that an express con-

---

5. The correspondence directed to GHI was that of WMC and contained the distinct letterhead: "H. C. Deyerberg, President." See plaintiff's exhibits 10, 11, 12, 14, 20, 25, 29, 42 and 47.

6. The following language is relevant in this regard: "[a]n invoice of this amount is also attached. Upon completion of our audit of *your* report, we will advise you of the final settlement." [emphasis added] Although the computation of the cost report is separately stated for Doctor's Hospital, the invoice is specifically directed to WMC.

tract is intended in view of the continuing and ongoing relationship between the parties—as to such matters as specific dates, place of payment, etc.—the overall impact of the dealings between GHI and WMC can only result in the reasonable inference that WMC was committing itself to the contractual obligations of its subsidiary, DHI. The business relationship between WMC and DHI further makes it clear that such a commitment would result in financial benefit to WMC in view of the fact that the continued maintenance of the hospital facility was necessary in view of the planned and proposed sale of real estate located at 1143 New Hampshire Avenue in the District of Columbia.[7] The evidence makes it abundantly clear that a direct and immediate benefit was flowing to the parent corporation in connection with the numerous extensions requested by WMC. These requests for extensions were made directly by the parent corporation WMC. The substance of letters flowing between WMC and GHI makes it clearly inferable that such extensions related to specific financial problems which WMC was then encountering. (See Exhibits 2, 29, 42, 45; T. 100–101). Moreover, the course of negotiations commenced by WMC, on behalf of DHI, do not reflect the usual parent subsidiary approach to such matters.

The negotiations and dealings between GHI and WMC as to the matter of the overpayments to DHI are further recorded in the continuing request made by H. C. Deyerberg for specific extensions of time within which to pay the excess overpayments made by GHI. Of particular significance is the undisputed fact that these requests for extensions of time were predicated on the financial straits of both DHI and WMC. (Plaintiff's Exhibit 29). In addition, the request for such extensions not only emanated from WMC, as the parent corporation, but also anticipated that the financial means to effectuate the ultimate repayment would come from WMC assets. It was, therefore, only natural that GHI would look to the parent corporation for the repayment of the obligation. In view of the ongoing nature of the negotiations, and the primary role played by H. C. Deyerberg as President of WMC, such a conclusion on the part of GHI was clearly not unreasonable.

On July 27, 1978, H. C. Deyerberg, acting as president of WMC[8], wrote to Benjamin Giuliani and requested that a nine-month extension be granted for the repayments because of a delay in the "... financing of the conversion of Metropolitan ...". (Exhibit 42). Of further relevance is the language contained in that same letter wherein H. C. Deyerberg states that "... Mr. C. J. Mangan [treasurer of WMC] has prepared a repayment schedule." (See Exhibit 42). GHI's reliance on the representations made by WMC is again demonstrated in turn by their reply dated August 7, 1978. (See Exhibit 43). The continued and updated requests for extensions made by WMC were not only made by this corporation, acting through its President, H. C. Deyerberg, but such requests were supported by reasons largely connected with the various financial problems relating solely to matters involving WMC. (For example, WMC requested a change in the repayment schedule to GHI because WMC needed money to pay their real estate taxes. (See Exhibit 29)). For the same reasons, it is clear that WMC was not in any way acting as an agent in the usual principal-agent role, because most of the correspondence was from H. C. Deyerberg, as "President of WMC." It is further clear that the forebearance[9] of

---

7. DHI was operating its facility from leased premises at 1801 Eye Street, N. W., and it was apparent that a move to 1143 New Hampshire Avenue was envisioned as a result of negotiations being conducted with AHS Management Services, Inc. (AHSMS).

8. Although H. C. Deyerberg became an officer of DHI sometime after 1976, the source of negotiations appeared to be from the parent cor-

poration, WMC, as the stationery and the testimony of the parties indicates. This is, of course, further buttressed by the testimony, both of H. C. Deyerberg as well as Benjamin Giuliani.

9. If GHI had exercised its contractual rights by withholding advance payments to GHI, such action would not only have resulted in immediate financial jeopardy to DHI but would have

GHI with respect to the specific matter of these overpayments was the direct and immediate result of WMC's own representations. Such forbearance, moreover, was entirely reasonable and expected as WMC had committed itself on prior occasions (see Exhibit 7) for such overpayments and there was nothing to indicate to GHI that WMC would withdraw from their prior course of conduct with respect to DHI, as its wholly-owned and principal subsidiary. Certainly, this longstanding course of conduct, initiated by WMC in 1972 by H. C. Deyerberg, was reasonably calculated and certain in its intent and goal. The nature and tenure of the requests related, in fact, to specific matters with which WMC was dealing (namely disposition of its facility at 1143 New Hampshire Avenue), and there is nothing to indicate that WMC was requesting such extensions solely for the benefit of DHI.

It is further clear from the evidence of record that such forbearance on the part of GHI resulted in their financial detriment. Because of the representations and specific requests, made by WMC, GHI reasonably chose to forego its contractual rights with respect to the subsidiary corporation, DHI, and as a result of the filing of the petition in bankruptcy by DHI on September 18, 1979, the only remaining responsible party for payment of this obligation was the parent corporation, WMC.

## ALTER EGO THEORY

 GHI, in an effort to establish liability on the part of WMC, requests that this Court pierce the corporate veil and disregard in turn the separate corporate existence of the parent WMC. In order to do so, this Court must be fully satisfied that certain stringent standards have been met.[10] The evidence of record satisfactorily demonstrates, however, that DHI was incorporated and maintained as a separate corporate entity; that it had its own Board of Directors and officers; that it maintained separate books and records[11] (although this was accomplished through a central accounting department with its parent WMC); that its functions were distinct and separate from those of its parent corporation; and that its separate identity, under the facts of this case, were clear to the public at large, including the claimants herein.[12] While there are instances of some intervention in the affairs of DHI, with particular reference to approval of certain business matters, such intervention does not appear to be unusual in the context of the usual parent-subsidiary operation. Clearly, the evidence adduced does not justify the conclusion that DHI was a mere instrumentality of its parent corporation, WMC.[13]

In fact, the evidence of record tends to belie GHI's own assertions in this regard, in

---

had devastating effects on WMC's plan to sell its facility at 1143 New Hampshire Avenue, which was to be used ultimately as an acute care facility by DHI.

**10.** The requirements set forth in *Lowendahl v. Baltimore & O. R. R.*, 247 App.Div. 144, 287 N.Y.S. 62, 76, aff'd 272 N.Y. 360, 6 N.E.2d 56 (1936), are as follows:

"(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

**11.** The records of DHI, of which the Court takes judicial notice, as set out in the separate bankruptcy file, clearly reflect that the trustee in bankruptcy had no problem in accounting for the separate assets and liabilities of DHI as a separate corporate entity.

**12.** The evidence establishes that the contract was entered into solely with DHI. (Exhibit 6). Subsequent negotiations were carried on by WMC, as a separate and distinct entity.

**13.** The corporate form of a company may be disregarded when that company functions merely as the "instrumentality" of another. *Garrow v. Soo Line R. R.*, 361 F.Supp. 764, 768 (E.D.Wis.1973). The prerequisites set forth in the *Garrow* opinion to determine whether one company is an "instrumentality" of the other are as follows:

that their own contract recognized the separate existence of both DHI and WMC. For example, in 1973, during the beginning period of time when these negotiations were commencing, GHI specifically received from WMC a separate note and deed of trust secured by real estate owned by WMC. This evidence, as well as the evidence contained in the separate estates of DHI and WMC, with respect to DHI's Chapter I–VII and WMC's Chapter XI proceedings, convinces the Court that a piercing of the corporate veil is not in order as DHI is not the alter ego of WMC.

## EXPRESS CONTRACT THEORY AND IMPLIED CONTRACT THEORY

The defendant also seeks to establish liability against WMC based upon the theory of express or implied contract. This argument is predicated primarily on the fact that the letters exchanged between the parties are written evidence of an express intention to assume the obligation of DHI for the overpayments made during the years 1977 through 1979.[14] The essential elements of either an express or implied contract, namely—offer, acceptance and consideration—are present under either theory. The difference between the two is that an express contract leaves no room for implications as the intent is reduced to a writing. The implied contract, however, is shown by the acts and conducts of the party, and is further interpreted by the surrounding circumstances of the case.[15] Although a strong and convincing argument is presented by GHI as to the existence of a contract with WMC, either express or implied, based on the numerous representa-

tions and requests emanating from WMC, the Court finds that there is no clear indication or inference that WMC intended to expressly contract with GHI, separate and apart from its subsidiary DHI. Nor is there any probative evidence that indicates that GHI intended that a separate contract with WMC on the matter of overpayments was to be entered into. This becomes clear based on the facts. For example, in 1973 GHI received from WMC a written commitment for the overpayments paid to DHI. The liabilities of WMC were defined by a note and deed of trust and specific terms, amounts and dates were therein set forth. However, as to the overpayments at issue in this litigation, there is no probative evidence that a separate and distinct contract was contemplated by the parties. This is further buttressed by the fact that there was already a contract in existence between GHI and DHI (see Exhibit 6) which set forth the rights and duties of the respective parties. It was with specific reference to this contract that the parties based their positions. In fact, as set forth in the findings of fact of this Court, specific computations for the overpayments were calculated for DHI and billing was separately directed to WMC. It is a principle of law that where an express contract is in existence, it is not proper to infer an implied contract of law.[16]

Because of conflicting versions as to what was intended, more by hindsight than by foresight, it is obviously possible to advance different inferences which can be drawn from the evidence. Based on the demeanor and credibility of the witnesses, as well as a careful and thorough review of the docu-

---

"... that control of one corporation by another is a necessary element and that the control must be a proximate cause of the alleged injustice at issue. Moreover, the control must not be merely theoretical. For instance, majority ownership alone is not enough, nor is it enough that the directors and officers of the principal are also directors and officers of the alleged 'instrumentality.' Rather, the theoretical control must be so exercised that the prime function of one corporation is but to serve the other." *Supra,* 361 F.Supp. at 768.

**14.** Although the claim as previously noted was predicated on overpayments made for these calendar years, the net figure claimed by GHI was calculated by a means of offset of 1979's *underpayment* against the excess advances of 1977, which had the effect of leaving an outstanding balance due and owing for the calendar year 1978.

**15.** 1 Corbin on Contracts § 18 at 41.

**16.** *Rogers v. American President Lines,* 291 F.2d 740, 742 (9th Cir. 1961).

mentary evidence introduced at the time of trial, this Court concludes that WMC did in fact intend to make the underlying contract between DHI and GHI its own. For this reason, the Court finds it unnecessary to further expatiate on the theories advanced by GHI as to express or implied contract.

## EQUITABLE ESTOPPEL

■ Equitable estoppel is a rule of last resort and is particularly appropriate in this case based on the conduct of the parties.[17] It is limited to making whole the person in whose favor the estoppel arises and is not given effect beyond that which is necessary to put the parties in the position they would have been in had the action which created the estoppel never existed.[18]

■ There are basically three elements of estoppel that relate to the party estopped. They are that:

"(1) the conduct (of the estopped party) amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert;

(2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and

(3) knowledge, actual or constructive, of the real facts." [footnotes omitted] [19]

■ The essential elements that must be found as to the party claiming the estoppel are that there be:

"(1) lack of knowledge and of the means of knowledge of the truth as to the facts in question;

(2) reliance, in good faith, upon the conduct or the statements of the party to be estopped; and

(3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment or prejudice." [footnotes omitted] [20]

■ Based on the record before the Court and the exhibits filed, the Court finds that the elements of estoppel have been met. In reaching this conclusion, the Court finds the following elements to support estoppel. First, as to WMC (the party estopped) there are facts that led GHI to believe that WMC had assumed the contract of DHI, a contention they now deny. For example, in April 1972, H. C. Deyerberg, then recently appointed Vice President of WMC, initiated a meeting between himself, Donald Farver and Benjamin Giuliani (both officers of GHI). This meeting was called to determine what WMC could do to prevent GHI from offsetting DHI's indebtedness for overpayments, against weekly payments GHI would be making to DHI. (T. 79, 125–127). H. C. Deyerberg stated to the representative of GHI that he could be relied on (T. 79) and made representations that he would now be the person with whom GHI would deal. This statement was made when H. C. Deyerberg was an officer of WMC, and on the Board of Directors of DHI, but he was not then an officer of DHI.

Subsequently, a check was sent to GHI in partial payment of the excess advances made during the years 1967–1970. WMC stated at that time in a letter to GHI that "we will send such a check every week until we will have repaid whatever amount is finally agreed to by the *Washington Medical Center, Inc. and Group Hospitalization, Inc.*" [Emphasis added] (Exhibit 4). On December 21, 1973, WMC give GHI a note secured by property owned by WMC for $775,000. This was for repayment of advances made by GHI to DHI. (Exhibit 7, T. 30). The note was subsequently paid off by WMC on May 19, 1976. (Exhibit 7).

**17.** 28 Am.Jur.2d, Estoppel and Waiver § 34 at 639 (1966).

**18.** *Id.*

**19.** 28 Am.Jur.2d, Estoppel and Waiver § 34 at 640 (1966).

**20.** *Id.* at 641.

Throughout the years, there continued to be a course of dealing between WMC and GHI regarding the overpayments to DHI. In April 1975, H. C. Deyerberg signed a letter in his capacity as President of WMC, in which he agreed with GHI's determination of the amount of the 1972 overpayments. (Exhibit 8). On October 17, 1975, H. C. Deyerberg of WMC wrote to Donald Farver of GHI, requesting a waiver of an independent audit of DHI. The reasons stated for the requested waiver was that WMC owed its accountant $180,000 and WMC was suffering a liquidity crisis. (Exhibit 12). It was also stated that money owed to the accountants by WMC and DHI were to be paid from money received from the sale of WMC property. (Exhibit 12).

On March 24, 1976, H. C. Deyerberg wrote to GHI proposing a repayment of the advances to DHI of at least $150,000 from the sale of property owned by WMC.[21] (Exhibit 14, T. 100–101). WMC also was the party who, on other occasions, requested extensions of time for the amounts owed to GHI. (Exhibits 2, 29, 42, 45, T. 100–101). It is also of importance that GHI, in its correspondence regarding the repayments, addressed its replies to either H. C. Deyerberg, the president of WMC, or Charles M. Mangan, the Treasurer of WMC. (Exhibits 30, 39, 43, 46). Also, throughout the course of dealing with GHI, H. C. Deyerberg's letters were sent on stationery headed "Washington Medical Center, Inc., H. C. Deyerberg, President." (Exhibits 10, 11, 12, 14, 20, 25, 29, 42, 47). Viewed together, these facts are clearly inconsistent with the proposition that WMC now advances that they never acted in a manner so as to lead GHI to believe they were assuming the debt of DHI.

WMC also asserts that their behavior was never intended to influence GHI's conduct. However, the Court finds that WMC's behavior indicates they had at least an expectation that their conduct would be acted upon or influence GHI's actions. An exam- ple of this would be the numerous requests made by WMC to delay the payments due under the contract to GHI. WMC had the intent that such a request would induce GHI to postpone payment of the debt. Because of WMC's behavior, they cannot now assert that they never intended to lead GHI to believe that WMC was assuming the debt of DHI.

GHI also meets the essential elements that a party claiming estoppel must prove. While GHI was aware they had a contract with DHI, the testimony of Mr. Giuliani at trial (T. 126–127) indicates that during the meeting between GHI and H. C. Deyerberg, Deyerberg stated to GHI representatives that he was the person GHI would now be dealing with in respect to financial matters. He also told them he would be honest with GHI in respect to WMC's financial position. He then requested GHI's cooperation while he attempted to find some means of repaying the overpayments. This transaction took place when H. C. Deyerberg was an officer of WMC and not of DHI. GHI, relying on these representations by Mr. Deyerberg, set up a course of dealing with WMC that continued for many years. In a letter sent by Benjamin Giuliani of GHI to Thomas Foley of WMC (Exhibit 3), he stated that it was GHI's understanding "that for the purpose of determining costs at Doctor's or Metropolitan Hospital, we are dealing with one corporation ...". Although this phrase related solely to cost determination, during the overall period of negotiations, nothing was ever done by WMC to contradict GHI's assertions. In fact, by WMC's silence on this matter, GHI had no means of knowing that WMC did not view themselves as assuming DHI's liabilities. A person may be estopped "from questioning the existence or effect of a contract the existence of which he has asserted to the other party to his own benefit or the injury of the other."[22] WMC, through its conduct, and through its silence,

---

**21.** This was later increased to $200,000. *See* letter of July 6, 1976, from Charles J. Mangan, Treasurer of WMC, to Benjamin Giuliani, of GHI.

**22.** 17 Am.Jur.2d, Contracts § 9 at 343–44 (1964).

led GHI to believe WMC was assuming the contract of GHI.

■■■■■ Under some circumstances, estoppel may be predicated on negligence.[23] Where a party causes another to believe certain facts to exist, and the other party relies and acts on that belief, equitable estoppel will be found.[24] Also, where one accepts the benefits of a contract, and here WMC was clearly benefited by the delay of the repayments, that party will be estopped to deny the validity or binding effect of the contract.[25] It has been held that a party need not formally agree to be bound to a contract to which he is a stranger, if after having knowledge of the contract, he enters into relations with one of the parties which is only consistent with the adoption of the contract.[26] While WMC at trial testified that they never intended to assume the contract as their own, their behavior clearly conveyed the impression to GHI that WMC was to be looked to for payment of the DHI debt. Where a person acts in a manner so as "to lead the other party to believe that he has made a contract his own, and his acts are only explicable upon that theory, he will not be permitted afterwards to repudiate any of its obligations."[27]

## CONCLUSION

For the reasons set forth above in this Memorandum Opinion, liability for the overpayments in issue must be ultimately assessed against WMC. The findings set forth in this Memorandum Opinion relate solely to the matter of liability on the part of WMC. In the event that a stipulation cannot be reached between the parties as to the amount due, this Court will schedule a hearing on that issue.

It is so ordered.

**23.** 28 Am.Jur.2d, Estoppel & Waiver § 41 at 648 (1966).

**24.** *Id.* § 61 at 683–84.

**25.** *Chisum v. Holbrook*, 281 P.2d 957 (Okla. 1954); *Massachusetts Bonding & Insurance Co. v. Vance*, 74 Okla. 261, 180 P. 693, 701 (1918).

**26.** *Wiggins Ferry Co. v. Ohio & Miss. Ry.*, 142 U.S. 396, 408, 12 S.Ct. 188, 191, 35 L.Ed. 1055 (1892).

**27.** *Id.* at 409.